2019 IL App (3d) 150821

Opinion filed August 30, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois. |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-15-0821 |
| v. | ) ) | Circuit No. 14-CF-589 |
| TIMOTHY J. McVAY, | ) ) ) | Honorable F. Michael Meersman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justice Holdridge concurred in the judgment and opinion.
Justice McDade concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1     The defendant, Timothy J. McVay, was convicted of first degree murder and concealment of a homicidal death after a bench trial. He was sentenced to 40 years in prison for first degree murder, with a consecutive 5-year term of imprisonment on the concealment charge. He appealed, and we affirm.

¶ 2                                         FACTS

¶ 3     The defendant, Timothy McVay, was charged by information on July 18, 2014, with the first degree murder of Carrie Olson (720 ILCS 5/9-1(a)(2) (West 2012)) and the concealment of

a homicidal death (720 ILCS 5/9-3.4(a) (West 2012)). The information alleged that the defendant committed the murder in Rock Island County on December 29, 2013, and concealed the homicidal death on that date. There were a number of law enforcement agencies involved, since the defendant lived in Illinois, Carrie was a resident of Iowa, and her body was found in Minnesota.

¶ 4       Carrie's family reported her missing to the Davenport, Iowa, police department when she did not show up for work on December 30, 2013. While Carrie was missing, on January 3, 2014, Detective Tina Noe of the Rock Island Police Department, who had been assigned to assist the Davenport Police Department in its investigation of the missing person, submitted a complaint and affidavit for a search warrant to search the defendant's home for evidence of a missing person. The complaint and affidavit stated that Noe had probable and reasonable grounds to believe she was looking for evidence that Carrie was a missing person, suspicious death, and/or homicide and recounted the evidence, including the defendant's admission that Carrie was at his home, the defendant had her car, and the defendant had used Carrie's debit card. The search warrant was granted on the basis of Noe's allegations that she had probable and reasonable cause to believe evidence of a missing person was in the defendant's home. The defendant later filed a motion to quash the search warrant and suppress evidence, which was denied. The trial court found that the search warrant was barebones, but that there was probable cause to believe that the search warrant should have been signed and executed.

¶ 5       A 12-day bench trial commenced on June 10, 2015. Carrie's father, Dave Olson, testified that Carrie lived in Davenport, Iowa, and worked at the family flooring business in Davenport. She drove a 2005 Toyota Avalon. Carrie's family was concerned when she did not show up for work on Monday, December 30, 2013. Dave went over to Carrie's home, and her boyfriend,

2

Justin Mueller, was there. Dave did not know that Mueller lived with Carrie. Mueller said that Carrie had not been home. Dave used Carrie's garage code to enter her house. He testified that the code on December 30 was 1-9-5-5. Dave testified that the garage code was 1-5-8-something when the defendant lived with Carrie, but she had changed it after they broke up and the defendant moved out. Dave and his wife, Karen Olson, called the police and made a missing person report. Dave and Karen checked Carrie's bank and phone records and determined that the last call on her cell phone was around 4 a.m. on December 29, 2013, and it was to the defendant. Dave texted and called the defendant several times on December 30; the defendant responded in the evening with a text saying that he was on a trip and he had not talked to Carrie that day. The defendant told Dave that Carrie had a key to the defendant's house and suggested that she might be hanging out over there, and so the defendant told Dave to go look for her at the defendant's home. Dave and some other family members went to the defendant's home, but Carrie was not there. The defendant told Dave that Carrie's car was at the Minneapolis airport. The defendant also told Dave that he was going to try to change his plans and come home on January 2, and he would bring Dave the car. The defendant texted Dave on January 2, around 1:35 p.m., that he was in Minnesota and leaving shortly to return to Davenport. Dave went to the police station around 5 p.m., expecting the defendant around that time, but the defendant did not arrive until around midnight.

¶ 6    The defendant returned Carrie's car, and Dave looked through it later that night in the police garage. The car had food wrappers on the floor and in the back seat, and Carrie's purse and boots were in the trunk. Dave did not see a blue blanket that Carrie usually had in her trunk.

¶ 7    Karen testified that she last saw Carrie on Friday, December 28, at around 1 p.m. Carrie had a fresh manicure. Carrie did not mention to Karen that she wanted to get away. Karen did not

3

know that Carrie was dating, and living with, Mueller. Karen knew that Carrie and the defendant had dated and lived together, but she did not know that they had remained friends. Karen testified that when the defendant returned Carrie's car, there was a blue purse in the trunk of Carrie's car, which contained Carrie's hairbrush, checkbook, and makeup bag. There was also a towel in the back seat of her car. Karen also testified that Carrie kept a royal blue blanket in her trunk, but it was not found in her car.

¶ 8    Carrie's sister, Jacklyn Crisci, testified that Carrie never let anyone borrow her car. She was also not aware that Mueller lived with Carrie, or that Carrie and the defendant remained friends.

¶ 9    Amanda Smith, Carrie's best friend, testified that she was in town for the weekend. She arrived in Davenport around 2 a.m. on Saturday, December 28. Carrie texted at 9:31 p.m. on December 28, saying that she was on her way home from Dubuque, Iowa, and wanted to meet up. Smith said she was going to bed, but they made plans to meet the next day. Carrie did not respond to any of Smith's messages on December 29. Smith did not think it was typical of Carrie to go to Dubuque by herself. Carrie had told Smith that she wanted to get away for a little bit. Smith knew that Carrie was having problems with Mueller.

¶ 10    Detective Noe testified that McVay was present when they executed the search warrant on his home on January 3, 2014. Noe testified that a boarding pass from Las Vegas to Minneapolis was found in the side pocket of a black leather duffel bag that appeared to be shiny and new. She described McVay's home as messy and unkept, and she noted several rolls of carpet stacked on top of each other in the living room area. After Carrie's body was eventually found, Noe was asked to do another search warrant for the defendant's residence. The second

4

warrant was executed on April 8, 2014. Several samples of carpet from the carpet rolls were collected and submitted to the crime lab.

¶ 11    Noe testified that Carrie's boyfriend, Mueller, was never a viable suspect for a number of reasons, including the fact that his cell phone records showed that he never left the area and he was excluded from the DNA under Carrie's fingernails. Noe thought it was odd that Carrie had any DNA under her fingernails because she had just had a manicure on the December 28, so any DNA would have been after that. Noe also reviewed Carrie's cell phone records and the defendant's cell phone records. Prior to Carrie's disappearance, they mainly texted, multiple times a day. The last telephone call on Carrie's phone was from the defendant at 3:58 a.m. on December 29. The defendant claimed that he called Carrie because she had left his residence to purchase some beverages. There were no telephone calls or text messages between Carrie and the defendant on December 30.

¶ 12    Noe testified that after Carrie withdrew $200 from the IH Mississippi Valley Credit Union in Davenport during the afternoon of December 28, there were no other withdrawals prior to the first incorrect PIN attempt in the early morning hours of December 29. Noe testified that the defendant stated that Carrie sent him out to get $400 in cash with her debit card at around 6 a.m. on December 29. Mapping the card usage in relation to the defendant's home, and the fact that he passed within blocks of his home twice, Noe found it odd that the defendant did not stop at home to ask Carrie the PIN—or call or text her to ask her the PIN. Also, the defendant claims to have taken Carrie home after these attempts, and despite several ATMs on the route to Carrie's home, he does not stop at another ATM.

¶ 13    Employees of the credit union testified that Carrie's debit card was used on December 28 at a 7-Eleven and a nail salon, and to make a $200 withdrawal with the correct PIN from a

Davenport ATM at 2 p.m. A receipt from her card showed that she bought a bag of chips, one pack of Camel cigarettes, one pack of Marlboro cigarettes, and gas at 4:07 p.m. at the 7-Eleven in Rock Island. Carrie's debit card was declined at 6:17 a.m. on December 29 for gas at the Git-N-Go station in Rock Island for an incorrect PIN. It was again declined at 6:22 a.m. at the 7-Eleven in Rock Island (also called Mother Hubbard's), but a $20 transaction was allowed at 6:23 a.m. inside the store, with no PIN required. Video surveillance confirmed that the defendant was using Carrie's card for the store purchase, and Carrie could not be seen in the car. At 6:33 a.m., three attempts were made to obtain $400 at a credit union ATM in Rock Island with an incorrect PIN, and Carrie's card was then blocked. The surveillance camera showed a car drive up and a man insert the ATM card, but the driver's face could not be seen. Carrie's PIN had been 1954, but she had changed it on December 20 to 1684.

¶ 14      The defendant's father, John McVay, testified that he and the defendant were supposed to drive to Kentucky or Tennessee to pick up the defendant's friend after Christmas, but when they did not hear from her, John went hunting on December 27. John did not know that the defendant was going to Las Vegas, but he was not surprised. The defendant's mother, Susan McVay, also did not know that the defendant was going to Las Vegas.

¶ 15      Tammy Hegi testified that she met the defendant in November 2013 and the two began dating. The defendant had told Hegi that he owned a construction company. The defendant told Hegi that he had employees and was working on a number of building projects. Hegi had planned a trip to Las Vegas and invited the defendant. She bought the defendant's ticket, but he was going to repay her. It was most economical to fly out of the Minneapolis airport. They discussed the defendant borrowing his sister's car. To avoid having two cars at the airport, Hegi suggested that the defendant park in her garage and get a ride to the airport from Hegi's friend,

6

Bonnie Gilbertson. The defendant was to fly to Las Vegas on December 29 to meet her, and they were to fly home together on January 1. Hegi sent the defendant several text messages on December 28, the last at 11:41 p.m.; he did not respond until 6:17 a.m. the next morning, stating that he was getting ready. He sent a text message at 7:35 a.m. that he was on the road. Hegi had emailed the defendant a map to her house, but the defendant said he entered her address into his navigation system in his cell phone and it took him a different route, which took him into Wisconsin. Hegi talked to the defendant on the phone at 12:14 p.m., and the defendant said he was coming out of Red Wing, Minnesota, which was about 15 minutes from her house. It took him longer than that to get to her house, but he said he got lost. Hegi believed the defendant to be near Highway 61 and 316, south of Hastings, between 12:14 and 1:35 p.m. Hegi texted and called the defendant several times between 2:58 and 3:33 p.m., with no response.

¶ 16     When he arrived in Las Vegas, the defendant met Hegi at their hotel and they went out on the town. The defendant had a black bag that was similar to the exhibit at trial. The defendant told Hegi that he left his phone at the front desk of the hotel to charge every night. Hegi was not aware that the defendant's friend was missing until the day they were leaving and someone called the defendant on the hotel landline. They got on their scheduled flight on January 1 and went to sleep after arriving at Hegi's home around 1 a.m. on January 2. The defendant left around 3 p.m. on January 2. Hegi testified that the defendant had planned to stay with her a few days longer, which is why he left a bag at her house. The defendant never repaid her the $400 he owed her for the flight and they broke up a month later.

¶ 17     Gilbertson testified that the original plan was to meet the defendant at Hegi's house at 2 p.m., but she got a telephone call from Hegi telling her it would be later, probably 3 p.m. Gilbertson testified that she got to Hegi's house at 3:15 p.m., and the defendant arrived about 20

7

minutes later. The defendant had two black medium-sized bags with him and he left one in Hegi's room. The defendant said that he wanted to change his shirt after traveling all day. Gilbertson then drove the defendant to the airport, dropping him off around 4:15 p.m. The defendant told Gilbertson that he was running late because he got lost south of Hastings.

¶ 18        Davenport police detective Richard Voy interviewed the defendant late on January 2. The defendant said that he had a close relationship with Carrie. The defendant said that Carrie was having trouble with Mueller and was going to tell him to move out. The defendant told Voy that Carrie came over to the defendant's house on December 28 around 3 p.m. and left about an hour later. She came back around 5 or 6 p.m., left again, and then came back around midnight. The defendant said that they sat on the couch and talked. He fell asleep and when he woke up, she was gone. The defendant called Carrie to ask her where she was around 4 a.m. on December 29 and she said she went out to get some drinks. Carrie also told him that she was supposed to meet Smith on Sunday (December 29) for dinner. Around 5:30 or 6 a.m. on December 29, Carrie was back at the defendant's home and he asked Carrie if she was still going to take him to the airport. The defendant told Voy that Carrie told the defendant to take her car, gave the defendant her debit card and asked the defendant to take $400 out of the ATM for her and top off the gas tank. She said that the PIN was the garage code. He remembered the garage code was 1584, but the ATM said the PIN was incorrect. He gave her back her ATM card and told her the PIN did not work, and she said that it was "Amanda's birthday." The defendant said Carrie told him to move some things in the car to the trunk, but she grabbed a coat and a black purse. The defendant told Voy that he dropped Carrie off at her house, in the parking lot of the medical center behind her house, and watched her walk into the garage. He then stopped at a gas station and then a tobacco

store. The defendant is seen on video surveillance at the Tobacco Outlet in Davenport at 7:55 a.m. on December 29, purchasing a cigar with cash.

¶ 19 Carrie's house and Mueller's truck were searched on January 3, 2014. No blood was found, nor were drugs or drug paraphernalia. The bed of Mueller's truck was not tested. A search of the defendant's home revealed a new-looking black travel bag that the defendant said he took with him to Las Vegas. There were several rolls of carpet in the living room that were unrolled and tested for blood. The trunk of Carrie's car was searched, but there was no DNA found.

¶ 20 Mueller testified that he lived at Carrie's house in December 2013 and he paid her $300 a month for rent. He and Carrie had gone out to a bar on December 27 in her car. He never drove her car. On Saturday, December 28, they made breakfast together and she stormed out of the house around noon. He did not expect her home after that because Smith was in town. He texted her a few times that day, and she responded to a text at 9:20 p.m. on Saturday, December 28. She did not come home on Sunday, and she did not respond to his texts at 4 and 8 p.m. that day. Mueller did not know the defendant, and Mueller had never been to Minnesota.

¶ 21 Carrie's body was discovered on April 5, 2014, in a field in Minnesota. The Dakota County Sheriff's Office and the Minnesota Bureau of Criminal Apprehension responded to the scene, finding a nude female with her arms overhead as if she had been dragged. A bar code sticker was found near the scene, which was later identified as belonging to a child's snow shovel sold at Big Lots.

¶ 22 Forensic anthropologist Dr. Gretchen Dabbs testified that Carrie's remains were in the early decomposition stage, likely due to the cold weather. Based upon the body location, recovery location, degree of decomposition, and appearance, Dr. Dabbs opined that Carrie was at the recovery site no later than March 11, 2014, but likely closer to December 28. Carrie's

9

manicure was still intact. Also, Carrie had a triangular-shaped mark on her left knee and marks on her inner right knee and ankle that had to occur postmortem. Dr. Dabbs opined that the body had been moved because the marks were not consistent with the position in which Carrie was found. Dr. Dabbs opined that Carrie was in a position that caused pressure on her left knee and inner right knee and ankle during the early postmortem period and then was moved to a position like she was found—on her back with a slight tilt to the right.

¶ 23     A shovel matching the bar code was sold at the Big Lots in La Crosse, Wisconsin at around 11:30 a.m. on December 29. There was no video surveillance available, but the purchase was made in cash and the person also bought a Desage Travel bag. The bag was not exclusive to Big Lots, but Detective William Thomas of the Davenport Police Department compared a photo of the Big Lots bag and the photo of the defendant's bag and they matched.

¶ 24     Forensic pathologist and medical examiner Dr. Owen Middleton performed the autopsy. Dr. Middleton found no identified cause of death, but Carrie's death was suspicious and he concluded that she died at the hands of another person since she was found nude, in a rural area, with her arms over her head, and no obvious trauma or natural disease. There was no identifiable injury to Carrie's neck. Carrie's drug screen revealed only aspirin and tobacco, neither of which contributed to her death. She also had some head trauma, that did not cause her death, but that was sustained around the time of her death. Dr. Middleton noted that Carrie had well-manicured nails, with the nail polish extending all the way to the cuticle. He also noted the geometric shape on Carrie's left knee that indicated something came into contact with her knee before she was placed where she was found.

¶ 25     Dr. Middleton ruled Carrie's death as a homicide by unspecified means. The prosecuting attorney presented three possible scenarios: (1) compression asphyxia, (2) smothering with a

pillow or hand, and (3) a sleeper hold. Dr. Middleton opined that all three scenarios were consistent with his findings.

¶ 26 Forensic scientist Sarah Walbridge-Jones conducted the trace fiber analysis. Walbridge-Jones concluded that the fiber found in Carrie's hair was a Berber carpet and matched one of the rolls of carpeting found in the defendant's home. It was a level 3 (out of 4 levels, level 1 being 100% match) match since it was mass manufactured. Walbridge-Jones testified that most trace exams were level 3 associations. Carrie did not have Berber carpet in her home. The fiber recovered from the trunk of Carrie's car did not match any of the known samples.

¶ 27 Adam Bazama, forensic scientist with the Minnesota Bureau of Criminal Apprehension, analyzed the sexual assault kit that was performed on Carrie, finding no DNA other than Carrie's DNA. He did Y chromosomal testing on the fingernail scrapings and obtained a partial match that was compared to the DNA profiles of David Olson, Mueller, and the defendant. Bazama testified that the comparison ruled out David and Mueller and that the defendant was a match. Statistically, one in three Caucasian males would also match.

¶ 28 The defendant's first wife, Nicole Manasco, testified that the defendant had never been violent with her or their children. She also testified that the defendant did not have visitation with their children the weekend of December 28-29, although he had texted Hegi that he had his kids. Cathy (Cati) Smiddy testified that she dated the defendant from January to May 2013, and then in October 2013, living with him in his home both times. She described an incident in May 2013 where she woke up on the couch and the defendant was sitting on her chest and bouncing up and down. The defendant did not immediately stop, and the incident terrified her because she could not breathe. The defendant told her the next day that he was just playing, but Smiddy testified that it did not seem like play. She moved out after that. Then, the defendant quit drinking and she

11

moved back in with him in October 2013. After a Halloween party, she came home from work and they each had a cocktail. She then put her daughter back to bed and dozed off. She woke up to the defendant screaming at her and pouring vodka and orange juice on her and her daughters. She shut the door and put the dresser against the door. The defendant was screaming and banging on the door, so Smiddy called the police. The police kept him in the kitchen while she packed her van with her belongings and left. She drove around all night because she did not have a place to stay. The defendant texted her in the morning that he would leave the house and she could have it to herself as long as she needed. So, Smiddy returned to the house and put her children in the bathtub to clean off the orange juice and vodka. While they were in the tub, the defendant came back and started screaming and seemed out of control. Smiddy taped the defendant on her phone but did not have the video. Smiddy moved out that day. About three weeks later, Smiddy went to visit family out of town. She testified that part of the reason she left town was to get away from him. She blocked him on her phone and on Facebook, but received some emails from the defendant in late December 2013 and early January 2014. During a June 2014 interview, Smiddy had denied that the defendant ever put his hands on her.

¶ 29        Diana Gross, Carrie's friend, testified that she was with Carrie on the evening of December 27. Carrie told Diana that she was going to see the defendant the next day and that he had a surprise for her. According to Diana, Carrie hoped the surprise was the money the defendant still owed her.

¶ 30        Zeus Flores, a computer forensic examiner with the Office of the Illinois Attorney General, High Tech Crimes Bureau, was tasked with examining the data from the defendant's cell phone. He found an excess of cookies related to the *Hastings Star Gazette* website, in relation to other news sites that the defendant visited. Examining the time frame of January 1,

2014, until April 4, 2014, there were cookies indicating that the defendant visited the *Hastings Star Gazette* site at least 43 times. Richard Nahnybiba, a police officer with the City of Davenport, Computer Forensic Unit, testified that the defendant's phone had visit counts of 100 to the general *Hastings Star Gazette* website between January 16, and April 8, 2014.

¶ 31      Mandy Britton from the Mid-States Organized Crime Information Center (MOCIC) created maps using cell phone tower information. She was asked to create maps to track Carrie and the defendant through their cell phone usage. She created a map of the cell phone towers that serviced the defendant's cell phone during the time period of December 29, 2013, through January 2, 2014. Britton was also given key addresses, which were included on the map, including the defendant's home address, Carrie's home address, the location of Carrie's remains, the location of Big Lots in La Crosse, and the address of Hegi's residence. Sprint only provides tower data for calls, not text messages.

¶ 32      The map shows that the defendant's call at 3:58 a.m. on December 29 to Carrie's phone was serviced by a Sprint tower close to his home in Rock Island, Illinois. The defendant's next call that day was logged at 12:14 p.m. in Minnesota, about half way between La Crosse, Wisconsin, and Rochester, Minnesota. His call at 12:58 p.m. was serviced by a tower on the north side of Rochester, Minnesota. From the cell tower information, Britton opined that the defendant was travelling northeast out of Rochester, toward where the next registered call, at 1:35 p.m., which was serviced by the southwest sector of a tower northeast of Rochester, within an area identified as the Richard J. Dorer Memorial Harwood State Forest. The defendant's call at 2:58 p.m. was serviced by the southwest sector of a tower in Wisconsin, which was located just across the state line from the location of Carrie's remains. The defendant's calls at 3:28,

3:32, 3:35, and 4 p.m. were serviced by the southern sector of a cell tower in Hastings, Minnesota, not in the area north of the Wisconsin tower.

¶ 33    Britton entered the tower information, along with the defendant's known location at the Tobacco Outlet Plus in Davenport, Iowa, at 7:57 a.m. and the Big Lots purchase at 11:29 a.m., into the mapping software and the software mapped the defendant's likely route. Britton approximated that the defendant would have arrived at the Big Lots at 11:03 a.m., in Rochester around 12:17 p.m., in the area near Carrie's body at 1:44 p.m., and at Hegi's house by about 1:57 p.m. Britton estimated the distance between where Carrie's body was found and Hegi's house was 4.3 miles.

¶ 34    Britton also mapped the defendant's cell phone activity for his return trip on January 2, 2014. There were 10 calls that were serviced by the Hastings tower near Hegi's home, between 1:24 and 3:02 p.m. Hegi testified that the defendant left her home around 3 p.m. There were two calls serviced by a cell tower located a dozen miles southeast of the Hastings tower, south of Carrie's body. A call at 3:18 p.m. was serviced by the west sector, while a call at 3:21 p.m. was serviced by the north sector of that tower. The next call was at 3:53 p.m., indicating that the defendant's cell phone was travelling southeast from the area where Carrie's remains were located. His route took him along the Mississippi River until a call at 6:29 p.m. south of Winona, Minnesota. The defendant then travelled west into Rochester, Minnesota, where his last call was at 7:13 p.m., and then toward Dubuque around 10:30 p.m., and arriving in the Quad Cities at around 11:45 p.m.

¶ 35    Britton testified that all Mueller's calls and all of David Olson's calls from December 29, 2013, through May 1, 2014, accessed Quad Cities or Iowa towers. On another map, Britton showed the cell phone activity of Carrie and the defendant on December 28 and the early hours

14

of December 29. The defendant had four calls during the day on December 28 and the 3:58 a.m. call on December 29, all serviced by the cell tower just south of his home, in Rock Island, Illinois. Carrie had two calls on December 28. A call at 9:37 a.m. was serviced by the Verizon cell tower just to the north of her home, in Davenport, Iowa. Her call at 1:16 p.m. to the defendant was serviced by a different Verizon tower, northeast of Carrie's home. Carrie's phone, for the call from the defendant to Carrie at 3:58 a.m. on December 29, was serviced by the western sector of a Verizon tower northeast of the defendant's home, in Rock Island, Illinois. Britton testified that, based on the tower location, it was possible that the call could have taken place at the defendant's home. Carrie's phone then did not connect to another cell tower until 3:49 p.m. on December 30, when it was serviced by a tower near Milan, Illinois, south of Rock Island. There are then 103 calls to Carrie's phone serviced by that same tower on December 30, with two calls that are terminated at another tower further to the southeast, in Illinois.

¶ 36        Renada Lewis testified that she was a custodian of records for Verizon Wireless. With respect to Carrie's cell phone, she testified that there was no tower data after the call on December 29, 2013, at 3:58 a.m., until a call at 3:49 p.m. on December 30. From that time until midnight of December 31, Carrie's phone either registered zeros or was serviced by tower 331 (which is the tower near Milan, Illinois). When it registered zeros, Lewis testified that could mean that Carrie's phone was powered off, or it could mean that the calls went straight to voicemail and cell sites were not captured. On December 31, 2013, at 8:42 a.m. and again at 6:20 p.m., Verizon attempted to find the real-time location of Carrie's phone. The coordinates at 8:42 a.m. indicate that Carrie's cell phone was north of Preemption, Illinois, and the coordinates at 6:20 p.m. indicate that Carrie's cell phone was just south of Preemption. Lewis testified that Verizon would not get a result if the cell phone was turned off, in airplane mode, or otherwise

15

not receiving a signal. Voy described the area where Carrie's cell phone last pinged as the area of Camden Park, which is in Milan, Illinois. There is also a landfill in the area.

¶ 37    The defendant presented no witnesses. In making its ruling, the trial court explained the difference between direct and circumstantial evidence, and the fact that there was not a lot of direct evidence. But, there was a lot of circumstantial evidence from which to draw reasonable inferences. And the only way for the pieces of circumstantial evidence to match the defendant's explanation was for everyone but him to be lying. The trial court described events leading up to December 28, including the numerous text messages between Carrie and the defendant, with never a mention of her taking him to Minnesota. Also, the trial court pointed to the map and the defendant's route to Hegi's house, noting that there was a significant amount of missing time in that trip and the return trip. The trial court noted the discrepancies with the defendant's cell phone activity while he was in Las Vegas. The court also pointed to the defendant's numerous visits to the *Hastings Star Gazette* website, even after Hegi had broken up with him. The trial court found that the travel bag was a small piece of the puzzle of circumstantial evidence, but given the bar code found at the scene, the route of travel, and the Big Lots receipt, the only reasonable inference was that the defendant purchased his travel bag at that Big Lots. The court concluded that the only reasonable inference to be drawn from all the pieces of circumstantial evidence was that the defendant murdered Carrie in his own home between 4 and 6:15 a.m. on December 29, 2013. The court found the defendant guilty of both counts and sentenced him to 40 years' imprisonment for first degree murder, plus a consecutive 5-year term of imprisonment on the concealment charge. The defendant appealed.

¶ 38                                    ANALYSIS

16

¶ 39    The defendant argues that the State failed to prove beyond a reasonable doubt that he murdered Carrie and concealed her body. The defendant contends that the State failed to prove that Carrie's death was a homicide, or that the defendant performed an act knowing that it created a strong probability of Carrie's death. The State contends that it proved beyond a reasonable doubt by extensive circumstantial evidence that the defendant murdered Carrie and concealed the homicide. When a defendant challenges the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 40    The defendant was charged with first degree murder in violation of section 9-1(a)(2) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(2) (West 2012)). Section 9-1(a)(2) states that one who kills a person without lawful justification commits first degree murder if, in performing the acts that cause the death, he knows that such acts create a strong probability of death or great bodily harm. Proof of an offense requires proof of two concepts: first, that a crime occurred, the *corpus delicti*, and second, that it was committed by the person charged. *People v. Ehlert*, 211 Ill. 2d 192, 202 (2004). In a prosecution for murder, the *corpus delicti* is the fact of death, along with the fact that death was due to criminal agency. *Id.* In this case, there is no direct evidence linking the defendant to Carrie's death. There is also no clear cause of death. However, circumstantial evidence is sufficient to sustain a criminal conviction if the evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged. *People v. Hall*, 194 Ill. 2d 305, 330 (2000). The trier of fact does not need to be satisfied beyond a reasonable doubt as to each link in the chain of circumstances, but rather that all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Id.*

¶ 41 Intent, such as the intent to kill or to cause great bodily harm, is a state of mind that is not usually established by direct evidence but may be inferred from the defendant's conduct and the surrounding circumstances. *People v. Barnes*, 364 Ill. App. 3d 888, 896 (2006). The medical evidence showed that Carrie's death was the result of murder and not the result of an accident. Carrie was found in a remote location, in the cold, nude, with her arms over her head, indications that Carrie did not slip and fall where she was found. The defendant was in possession of Carrie's ATM card and Carrie's car. The circumstantial evidence and the reasonable inferences drawn therefrom showed that the defendant was the person to murder Carrie and that, when he committed those acts, he did so with the intent to kill her.

¶ 42 Cause of death is a question for the trier of fact. *People v. Fuller*, 141 Ill. App. 3d 737, 748 (1986). Dr. Middleton, an expert in forensic pathology, ruled that Carrie's death was a homicide, by unspecified means since the mechanism of death could not be explained by the anatomic findings. He based his ruling on the fact that Carrie was found naked in a remote wooded area far from home with her arms over her head. He ruled out other potential causes of death, such as death by natural causes, suicide, and accident. He opined that Carrie died from some type of asphyxia. No medical examiner disagreed with Dr. Middleton's assessment as to Carrie's cause of death. The defense did not produce an expert to dispute the cause of death.

¶ 43 We find that the circumstantial evidence was sufficient to prove beyond a reasonable doubt that Carrie's death was a homicide. Also, the circumstantial evidence proves beyond a reasonable doubt that the defendant was the one who murdered Carrie. The defendant admitted to detectives that Carrie was at his house on the night of December 28 through around 6 a.m. on December 29. He was the last person to see her alive. He had Carrie's car and her debit card, and he unsuccessfully tried several times to use the debit card with the incorrect PIN number. Despite

18

almost daily communication, he never texted or called to ask her for the correct PIN. Carrie's body was found five hours from where she lived, less than five miles from Hegi's house in Hastings, Minnesota, where the defendant admittedly travelled on the day after Carrie was last seen. The evidence showed that the defendant took a significant amount of time to travel to Hastings, and cell tower information places him in the area where Carrie's body was found. The defendant is seen on video leaving the Tobacco Outlet in Davenport, Iowa, at 7:57 a.m., but he did not arrive at Hegi's house in Hastings until 3:30 p.m., an approximately five hour trip that took him seven and a half hours. Within that time frame, a shovel and a black travel bag were purchased at the Big Lots in La Crosse. A sticker from the shovel was found near Carrie's body, and the black bag was identified as matching the bag that the defendant used to travel to Las Vegas. There was no evidence presented that the defendant bought the bag somewhere else. Also, the evidence showed that the defendant searched the local news website in Hastings starting in mid-January 2014. After March 15, the defendant visited the website almost every day. He and Hegi had broken up in February and had no contact after March 5, 2014. But, by March 15, the weather had started to warm up and the snow was starting to melt. In addition, there was DNA found under Carrie's newly manicured fingernails for which the defendant could not be excluded, and the carpet fiber found in Carrie's hair was consistent with the carpet in the defendant's home.

¶ 44    To sustain a conviction of concealment of a homicidal death, there must be an act of concealment of a death by one who knows that the victim died by homicidal means. 720 ILCS 5/9-3.4(a) (West 2012); *People v. Salinas*, 365 Ill. App. 3d 204, 208 (2006). The concealment can occur at the location where the body is found, but it can also occur when a body is removed from a murder site and transported for the purpose of delaying the discovery of the homicide.

*People v. Clark*, 278 Ill. App. 3d 996, 1005 (1996). Considering all of the circumstantial evidence together, we find that the State proved beyond a reasonable doubt that the defendant murdered Carrie and that he concealed her homicide.

¶ 45    The defendant argues that the State failed to prove that Illinois had jurisdiction to prosecute the defendant because it did not show that either the murder or the concealment of a homicidal death occurred in Illinois. The defendant contends that the murder is presumed to have occurred in Minnesota since Carrie's body was found there. The State contends that it proved beyond a reasonable doubt that the murder was committed at the defendant's house in Rock Island, Illinois.

¶ 46    Generally, a person is subject to prosecution in Illinois if an offense is committed either wholly or partly within the State. 720 ILCS 5/1-5(a)(1) (West 2012). In a homicide, if the body is found in Illinois, the death is presumed to have occurred in Illinois. 720 ILCS 5/1-5(b) (West 2012). If there is no presumption arising from the finding of the body in Illinois, then jurisdiction must be proven beyond a reasonable doubt. *People v. Sims*, 244 Ill. App. 3d 966, 1004 (1993) (citing *People v. Holt*, 91 Ill. 2d 480 (1982)). Jurisdiction can be proven by circumstantial evidence. *People v. Blanck*, 263 Ill. App. 3d 224, 230 (1994).

¶ 47    The circumstantial evidence, taken as a whole, proves beyond a reasonable doubt that Carrie was murdered in Illinois in the defendant's home, before the defendant tried to use her debit card at 6:17 a.m. on December 29. Carrie's last call, at around 4 a.m. on December 29, was serviced by a tower in Illinois, near the defendant's home in Illinois; the defendant admitted Carrie was at his home before and after that call; Carrie's phone continued to ping off Illinois cell towers after that time until there was no longer a signal; carpet fibers found in Carrie's hair were consistent with the carpet in the defendant's home; and the defendant used Carrie's debit

20

card in Illinois. Also, there were marks on Carrie's body that showed that she was moved after her death, evidence that where she was found in Minnesota was not where she died. That circumstantial evidence, along with the fact that there was no evidence that Carrie was murdered where she was found in Minnesota, was sufficient to prove jurisdiction beyond a reasonable doubt.

¶ 48    Lastly, the defendant argues that the trial court erred in denying his motion to quash the search warrant and suppress evidence because the warrant application failed to state an offense and no probable cause existed to search the defendant's home. Courts apply a two-part standard of review to a trial court's ruling on a motion to suppress evidence: factual finding are reversed only if they are against the manifest weight of the evidence but the ultimate legal ruling is reviewed *de novo*. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006).

¶ 49    The exclusionary rule provides that evidence obtained in contravention of the fourth amendment's protection against unreasonable searches and seizures will be suppressed. *People v. Rojas*, 2013 IL App (1st) 113780, ¶ 15. Probable cause, which is required for issuance of a search warrant, measures the probability of criminal activity, rather than proof beyond a reasonable doubt. *Id.* Probable cause exists if the totality of the facts and circumstances known to the affiant is sufficient to warrant a person of reasonable caution to believe that an offense occurred and that evidence of that offense is at the location to be searched. *Id*. In other words, there must be an established nexus between the criminal offense, the items to be seized, and the place to be searched. Reasonable inferences may be drawn to establish the nexus; direct information is not necessary.

¶ 50    The defendant cites to *People v. Dace*, 153 Ill. App. 3d 891 (1987), for the proposition that just being the last person known to be with the victim while she was alive was not sufficient

21

to establish probable cause. The holding in *Dace* was *dicta*, but also the victim in that case was found at her place of employment and the only allegation against the defendant was that he was the last person known to be with her there. *Id*. at 897. The time frame was fairly broad, and there were no other allegations, such as a criminal history against women or a specific item or weapon. *Id*. The *Dace* court distinguished its factual circumstances from *People v. Gacy*, 103 Ill. 2d 1 (1984), where the defendant was the last to be seen with the victim, but also had a history of sexual offenses against teenage boys and the victim was only missing 20 minutes before his mother went looking for him. The *Dace* court also distinguished *People v. Creach*, 79 Ill. 2d 96 (1980), wherein the defendant was not only the last person to see the victim alive, but he also had her car and had unexplainably left the state on the morning after the victim's death.

¶ 51    Carrie had been missing for six days when the warrant application was filed. The defendant admitted that she had been at his house on the day she disappeared, and he had her car and her debit card. The complaint and affidavit stated that the authorities were looking for evidence of a missing person in the defendant's home and any vehicles—Carrie's missing belongings and trace evidence. Although the trial judge on the motion to quash referred to the warrant as barebones, he found that there was probable cause to believe the search warrant should have been signed and executed. The complaint in *Gacy* did not cite to a specific crime; like this case, it was concerned with a missing person. *Gacy*, 103 Ill. 2d at 19-20. Since the complaint and affidavit indicated more than the defendant was the last person to see Carrie alive—also that he had her car and her debit card, and that she was not dropped off at home as he claimed—there was probable cause for the warrant.

¶ 52                                CONCLUSION

¶ 53    The judgment of the circuit court of Rock Island County is affirmed.

22

¶ 54    Affirmed.

¶ 55    JUSTICE McDADE, concurring in part and dissenting in part:

¶ 56    The majority has affirmed the convictions of defendant, Timothy McVay, of first degree murder and concealment of a homicide. I concur with the decision finding, beyond a reasonable doubt, that defendant concealed the death of Carrie Olson. I also agree that the evidence and all reasonable inferences drawn from that evidence amply support a finding that McVay caused Carrie's death and then deliberately did everything he could to conceal it. I cannot, however, find evidence that shows, beyond a reasonable doubt, that he intended to kill her. The prosecutor suggested three ways in which Carrie might have been killed; as the State's forensic pathology expert concluded, death was by unspecified means because the mechanism of death could not be explained by the anatomic findings. *Supra* ¶ 42. None of them *required* intent to achieve her death. Or put another way, she could have been killed by McVay in any of the ways posited without him harboring any intent to kill. Therefore, I dissent, not from a finding that he is guilty of homicide in connection with Carrie's death but from a finding that that homicide was first degree murder beyond a reasonable doubt.