2025 IL App (1st) 240993-U

No. 1-24-0993

Order filed December 10, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 20 CR 8746 |
| JERMY TERRY, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Steven G. Watkins, |
| | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Martin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's judgment, which found defendant guilty of first degree murder and subsequently sentenced him to 45 years' imprisonment, is affirmed.

¶ 2    On May 16, 2020, around 7 p.m., defendant Jermy Terry shot and killed Jerry Montgomery on the west side of Chicago as Montgomery was walking down the street. Defendant was subsequently convicted of first degree murder following a bench trial and sentenced to 45 years in the Illinois Department of Corrections. Defendant now appeals his conviction, arguing that he

should have been convicted of involuntary manslaughter or second degree murder or, alternatively, that the State's comments during closing argument deprived him of a fair trial.

¶ 3       For the reasons that follow, we affirm the judgment of the trial court.[1]

¶ 4                                    I. BACKGROUND

¶ 5       On September 22, 2020, the State charged defendant with six counts of the first degree murder of Montgomery. On December 12, 2023, defendant waived his right to a jury trial and the matter proceeded to a bench trial.

¶ 6       At trial, the State introduced multiple portions of video recordings that captured different aspects of the shooting of Montgomery. Given that defendant admitted to shooting Montgomery, and this case turns entirely on defendant's intent, these videos are critical in reviewing whether defendant had the requisite mental state for first degree murder. We summarize the most pertinent of these videos here.

¶ 7       People's Exhibit 49 was a video taken from a gas station on the corner of South Leamington Avenue and Madison Street in Chicago, Illinois. The camera was angled southwest so that it captured the gas station's entrance/exit on South Leamington and part of the station's lot. The video, which is 82 seconds long, shows three people, two men and one woman, standing on the sidewalk next to the gas station's entrance. Montgomery walks through the gas station's lot and past the three individuals standing on the sidewalk, heading south down South Leamington on the sidewalk. Montgomery disappears from view behind a building. Approximately 56 seconds into the video, the three remaining individuals flee north toward the camera through the gas station's

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

lot. Approximately 59 seconds into the video, Montgomery reappears, sprinting northbound on the side of South Leamington opposite the gas station. Approximately 73 seconds into the video, Montgomery is directly across South Leamington from the gas station. He slows, stumbles, and collapses onto the sidewalk behind a parked car.

¶ 8      People's Exhibit 52 was a recording taken from a camera placed on the corner of South Leamington and Madison, facing directly south down South Leamington toward Monroe Street. Compared to People's Exhibit 49, the intersection of South Leamington and Monroe is visible. The same three individuals standing on the sidewalk next to the gas station's entrance are visible. In the video, which is 77 seconds long, Montgomery can be seen walking past the three individuals once again, heading south on South Leamington on the same side of the street as the gas station toward Monroe. Forty-six seconds into the video, Montgomery appears to be approximately 10 to 15 feet away from the corner when a figure rounds the corner at the intersection of South Leamington and Monroe. Montgomery, the three individuals at the gas station, and the shooter who was ultimately identified as defendant are all oriented in a line on the same sidewalk. The three individuals outside the gas station flee out of frame to the left and Montgomery, hunched over, crosses South Leamington and begins running north toward Madison. Defendant disappears around the corner and the video ends with Montgomery disappearing out of frame to the right.

¶ 9      The still image included below, captured from People's Exhibit 52 approximately 46 seconds into the video, shows the moment when defendant turned the corner and began shooting. Defendant can be seen standing with his legs apart in a v-shape.



¶ 10    People's Exhibit 51 was a video of a camera positioned on a building on the Monroe-side of a building on the corner of South Leamington and Monroe. The camera is pointed southwest toward the intersection. Four seconds into the video, defendant appears wearing white gloves and walking west toward the corner. Defendant reaches the corner and lingers for a moment, looking up South Leamington toward Madison. He then retreats away from the corner before returning and peering around the corner a second time. Defendant retreats a second time and appears to pull a mask over his face, withdraws a gun from underneath his sweatshirt, and rounds the corner. Just before he disappears from view, he can be seen raising the weapon. After approximately six seconds, defendant reappears, sprinting east and across Monroe before disappearing out of the frame to the left.

¶ 11    Chicago police detectives Christopher Cannata and Kevin Graney both testified that they were familiar with the area of South Leamington between Madison and Monroe where Montgomery was shot. Cannata testified the area was well-known for having high amounts of gang

activity, and that one of the gangs that operated in the area was Mafia Insane, a sub-faction of the Vice Lords. Cannata was familiar with defendant prior to the death of Montgomery and, after reviewing the security footage from the area, recognized defendant as the shooter. Graney likewise testified that he was acquainted with defendant prior to this case and interacted with him hundreds of times. Graney also reviewed the security footage and recognized defendant as Montgomery's killer.

¶ 12    Chicago police officer Nathaniel Warner testified that he first met defendant in 2013 or 2014, and that defendant, who was also an enforcer for Mafia Insane, was registered as a confidential informant. Beginning in 2015, defendant supplied Warner with information that resulted in five to ten arrests, including arrests of Mafia Insane members. When Warner learned of the shooting on May 16, 2020, he called defendant to check on him because he knew defendant frequented that area and was both concerned for defendant's safety and because he wanted to find out if defendant knew anything about the shooting. Warner stated that defendant made him aware of threats to defendant's life while defendant was a confidential informant and that a "hit" had been ordered on defendant.

¶ 13    When Warner watched the security camera footage related to the shooting, he identified defendant as the shooter, and he was able to identify one member of Mafia Insane standing in front of the gas station. None of the individuals visible in the video were individuals that defendant provided any information on as part of his role as a confidential informant. According to Warner, Mafia Insane controlled the area that included the gas station on South Leamington and there had been other murders in that area prior to May 16, 2020.

¶ 14    Detective Greg Swiderek testified that he was assigned to investigate the homicide that took place on South Leamington on May 16, 2020. After Swiderek obtained and reviewed the footage from multiple cameras that captured the shooting, defendant was identified and arrested. Swiderek then interrogated defendant with the help of Warner. During the course of that interrogation, defendant was shown the security footage related to the shooting of Montgomery, and defendant admitted that he was the shooter in the videos.

¶ 15    Defendant testified that he met Warner in 2013, and that Warner was a mentor to him. Defendant helped Warner with five to ten cases, and his work involved purchasing firearms from Mafia Insane. In 2019, defendant bought two guns from a high-ranking member of Mafia Insane. The same individual was arrested the following day for attempted murder and defendant began to fear that his life was in danger.

¶ 16    Between January and March of 2020, defendant recalled three incidents that frightened him. In the first, he asked a friend to pick him up from a recording studio and the same Mafia Insane member was in the car. Defendant got scared when the driver locked the doors, so he climbed out the window. On another occasion, defendant was at the same recording studio when three men showed up asking if defendant was there. Defendant snuck out of the building to evade them. On a third occasion, defendant was in a car when another car tried to box them in and the occupants brandished firearms. After a car chase, defendant managed to escape. These three incidents led defendant to believe that Mafia Insane "had a hit out" for him and that they were trying to kill him.

¶ 17    On May 16, 2020, defendant was homeless and headed to his uncle's home in the area of South Leamington and Monroe in search of a place to stay. After defendant's uncle told him he

could stay there, defendant went back outside to scout the area and see if it was safe for him to stay there. When defendant reached the corner of South Leamington and Monroe, he saw multiple members of Mafia Insane by the gas station, though he insisted the people he saw were not the three visible on the surveillance camera, but rather further down the street on the corner of South Leamington and Madison. Defendant identified these additional people as Rick Duke, Monster, Greaze, and Carnell Morris, who was also known as Murder. None of the videos admitted into evidence reflect the presence of these additional people on the corner of South Leamington and Madison.

¶ 18    When asked why he fired his gun, defendant stated, "I was just, you know, shooting a couple pop shots in the air just to scare the guys off the corner. I had no intent to harm anyone." When asked if he was aiming at anyone, defendant replied, "No, ma'am, I was a block away. I knew I wouldn't hit anyone." Defendant insisted that when he saw the gang members by the gas station, he thought they were going to try to kill him. Defendant claimed he never saw Montgomery when he fired. When asked whether his feet were apart, defendant replied, "Kind of. It is but it isn't, like they're open."

¶ 19    When asked to describe how he fired the gun, defendant stated that he tried to shoot "into the air." Defendant also acknowledged that Montgomery was 10 or 15 feet away when he started shooting. He claimed that he believed the Mafia Insane members by the gas station saw him when he turned the corner, but he admitted that none of them moved toward him. He based his belief that they saw him on the fact that some of the individuals were facing him.

¶ 20    The parties stipulated that defendant had three prior felony convictions, with one being for unlawful use of a weapon by a felon, and another being possession of a firearm without a Firearm

Owner's Identification Card. The third was not specified. They also stipulated that Montgomery died of a single gunshot wound to the mid-right side of his chest that pierced multiple parts of his heart and right lung. Finally, the parties stipulated that three fired cartridge cases, each stamped "Hornandy 380 Auto," were recovered from the sidewalk on South Leamington and that the three cartridge cases were fired from the same weapon.

¶ 21 On February 22, 2024, the trial court issued its ruling, finding defendant guilty of first degree murder. It reasoned that defendant intended to kill Montgomery or inflict great bodily harm, and that defendant possessed no justification for his use of force. Addressing defendant's arguments about his mental state, the trial court stated the following:

"In support of the suggestion that this court find defendant guilty of a lesser included offense, defense would have the court find either that at the time of the offense defendant's behavior was either reckless in support of a verdict of involuntary manslaughter or the defendant had an unreasonable belief in self-defense at the time of the offense. Each is rejected because each is not supported by the evidence. Defendant acted intentionally and knowingly at the time of the offense."

¶ 22 Regarding imperfect self-defense, the trial court also reasoned:

"At the time of the offense not one person, gang member or otherwise, displayed a weapon, pointed out the defendant, called his name, said let's go get him or nothing of the sort. Nothing."

¶ 23 Finally, regarding defendant's intent, the trial court reasoned, "Let's not forget defendant pulled out of his waistband his loaded 30-clip [*sic*] weapon while he was behind that wall. Why did he do that? Because he intended to prepare to kill, and he did."

¶ 24    Following a sentencing hearing, the trial court sentenced defendant to 45 years in the Illinois Department of Corrections. Defendant timely filed a notice of appeal the same day.

¶ 25                                II. ANALYSIS

¶ 26    Defendants raises two arguments on appeal. He first argues that the State failed to prove him guilty beyond a reasonable doubt of first degree murder, and that he should have instead been convicted of involuntary manslaughter or second degree murder. Alternatively, he argues that the State's comments in closing argument deprived him of a fair trial. We address these issues in turn.

¶ 27                       A. Sufficiency of the Evidence

¶ 28    We first address defendant's argument that he should have been convicted of involuntary manslaughter or second degree murder, and that the evidence did not establish beyond a reasonable doubt that defendant committed first degree murder.

¶ 29    Due process protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S. Const. amend. XIV; *In re Winship*, 397 U.S. 358, 364 (1970). It is fundamental to our system of criminal justice that a defendant is presumed innocent and the State bears the burden of proving each element of the charged offense beyond a reasonable doubt. *People v. Weinstein*, 35 Ill. 2d 467, 460 (1966).

¶ 30    When determining whether the evidence at trial was sufficient, the question is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004).

¶ 31    A defendant commits first degree murder, for the purposes of this case, when he kills an individual without lawful justification and either: (1) intends to kill or do great bodily harm to the

individual or another, or knows that his actions will cause death to the individual or another, or (2) knows that his actions create a strong probability of death or great bodily harm to that individual or another. 720 ILCS 5/9-1(a)(1), (2) (West 2020). A defendant's intent may be inferred from his conduct and the surrounding circumstances. *People v. McVay*, 2019 IL App (3d) 150821, ¶ 41.

¶ 32     In contrast, a defendant commits involuntary manslaughter when he performs acts likely to cause death or great bodily harm to another and he performs those acts recklessly. *DiVincenzo*, 183 Ill. 2d at 250; 720 ILCS 5/9-3(a) (West 2020). Recklessness is statutorily defined as when a person "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2020).

¶ 33     The basic difference between involuntary manslaughter and first degree murder is the mental state that accompanies the conduct resulting in the victim's death. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998) (overruled on other grounds by *People v. McDonald*, 2016 IL 118882). Involuntary manslaughter requires a less culpable mental state than first degree murder. *DiVincenzo*, 183 Ill. 2d at 249.

¶ 34     A person commits second degree murder when a person commits the offense of first degree murder either because they intended to kill or their actions carried a strong probability of death, but they did so with the unreasonable belief that circumstances existed at the time of the killing that would justify the killing. 720 ILCS 5/9-2(a)(2) (West 2020).

¶ 35     We can begin by examining the elements of this offense for which there is no dispute. It is undisputed that defendant fired the bullet which struck Montgomery, and that bullet was the

singular cause of Montgomery's death. The medical examiner's conclusions were stipulated to by the parties, and defendant readily admitted, during his interrogation and his trial testimony, that he shot Montgomery. The only contested issue was whether defendant possessed the requisite intent for first degree murder.

¶ 36     Defendant testified that he never intended to shoot anyone and that he was trying to aim and fire into the air to scare away the gang members because he feared for his safety. The trial court found defendant's claims incredible for good reason. As we summarized earlier, when defendant rounded the corner and began firing, Montgomery was 10 to 15 feet directly in front of defendant. The three other individuals visible on the videos were standing on the sidewalk further down the street but otherwise more or less in line with Montgomery.

¶ 37     In order for defendant to have struck Montgomery in the chest, the firearm would have had to be on a relatively flat plane aiming down the sidewalk toward Montgomery, the three individuals down the block visible on the videos, and the four other individuals that defendant claimed were on the corner. Clearly, defendant was not aiming into the air. And the notion that he tried to point his weapon in the air but somehow failed and instead managed to aim it directly at a person in front of him exceeds the bounds of all credibility. Defendant went to that corner armed, wearing gloves in May, and donned a mask just prior to the shooting. When combined with defendant's behavior in which he twice peered around the corner, drew his weapon, turned the corner a third time, adopted a firing stance as seen in the included still, and opened fire immediately, a rational trier of fact could have concluded that defendant had the requisite intent for first degree murder as opposed to this being reckless behavior.

¶ 38    Likewise, the trial evidence disproved beyond a reasonable doubt that defendant had a sincere but unreasonable belief that the use of force was necessary for self-defense. See 720 ILCS 5/9-2(c) (West 2020) (The State bears the burden of proving the elements of first degree murder beyond a reasonable doubt, and if a defendant can establish a mitigating factor by a preponderance of the evidence, the State bears the burden of proving beyond a reasonable doubt the absence of the mitigating factor). Based on the videos admitted into evidence, there was no indication that any of the individuals in front of the gas station moved toward defendant, did anything threatening, or even knew defendant was there before he started shooting other than defendant's claim that some of them were looking in his direction when he rounded the corner. Not only was defendant not in any apparent danger, but nothing about the circumstances of this crime provided any subjective means to conclude that defendant sincerely believed deadly force was required. To the contrary, defendant went out of his way to open fire on a group of unsuspecting individuals a block away, and Montgomery was in a place where he had every right to be when he was tragically shot by defendant.

¶ 39    The trial court was in the best position to evaluate the credibility of defendant's explanation why he felt he was in such danger that it necessitated the use of deadly force. A rational trier of fact could have concluded that defendant's actions and the circumstances of this offense sufficiently demonstrated his guilt and disproved defendant's claim that he sincerely believed that deadly force was necessary to defend himself.

¶ 40    Accordingly, the evidence was sufficient to convict defendant of first degree murder.

¶ 41                                    B. The State's Closing Argument

¶ 42    Defendant next argues that the State committed reversible error when it misstated the law regarding second degree murder and misstated the evidence. Specifically, he argues that the State committed error when it stated in its rebuttal argument that second degree murder requires an imminent threat and when it claimed that Montgomery was "mere feet" away from defendant when he fired.

¶ 43    A timely trial objection and a written post-trial motion raising the issue are required to preserve an issue for consideration on appeal. *People v. Harris*, 195 Ill. App. 3d 507, 511 (1990). Here, defendant did not make a timely objection to either of these issues, nor were they raised in defendant's posttrial motion or the subsequent supplemental posttrial motion.

¶ 44    Nevertheless, we may review unpreserved errors when either (1) the evidence is close, regardless of the seriousness of the error or (2) the error is so serious that it affected the fairness of defendant's trial. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). However, when reviewing a claim of plain error, the first step is to determine whether any error occurred at all. *Id*. at 565.

¶ 45    First, defendant claims that the State erred when it referred to Montgomery as being "mere feet" away, or that Montgomery was shot at "point blank range." Defendant testified at trial that Montgomery was 10 to 15 feet away from him when he fired, while also claiming that he did not see Montgomery when he fired. Prosecutors are, of course, allowed wide latitude in closing arguments. *People v. Williams*, 2022 IL 126918, ¶ 44. We do not find these comments to be error, as they were nothing more than argument interpreting the evidence. "Mere feet" is an apt way to describe Montgomery's distance from defendant, and "point blank range" is a reasonable,

rhetorical method of underscoring that defendant, who allegedly feared for his life, opened fire on an allegedly unseen innocent bystander walking toward him only a few feet away.

¶ 46    We also do not find the State's comments about second degree murder to be error. Closing arguments should be considered in the context of the arguments as a whole. *Williams*, 2022 IL 126918, ¶ 44.

¶ 47    At the start of its rebuttal argument, the State claimed, "[T]his is not a second degree murder case. The defense fails pretty immediately based on imminence. Second degree murder requires an imminent threat, the imminent use of unlawful force." This argument was made in response to the end of defendant's closing argument in which defense counsel stated that defendant's actions were "the proper reaction to stimuli of seeing people who you know are trying to harm you because you've had instances months earlier, not a year earlier, just within the last 60 to 90 days of instances where individuals were trying to harm you."

¶ 48    During its ruling, the trial court stated that there was "no justification" for defendant's use of force, and that "at the time of the offense, not one person, gang member or otherwise, displayed a weapon, pointed out the defendant, called his name, said let's go get him or nothing of the sort. Nothing." Defendant claims that these comments by trial court demonstrate that it adopted an incorrect legal standard put forth by the State. We disagree.

¶ 49    The affirmative defense of self-defense allows force "which is intended or likely to cause death or great bodily harm" only when the defendant "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." 720 ILCS 5/7-1(a) (West 2020). Thus, the use of deadly force is not authorized for *any* imminent harm; only imminent death or great bodily harm. *Id*.

¶ 50    Second degree murder, on the other hand, requires that a defendant kill another while under the belief that the circumstances justify the killing, but that belief is unreasonable. 720 ILCS 5/9-2(a)(2) (West 2020). A defendant must prove the existence of this mitigating factor by a preponderance of the evidence, at which time the State must still prove beyond a reasonable doubt the elements of first degree murder and the absence of circumstances that would justify or exonerate the killing. 720 ILCS 5/9-2(c) (West 2020); *People v. Jeffries*, 164 Ill. 2d 104, 114 (1995). Inherent in the mitigating factor that is second degree murder is the defendant's unreasonable belief that he is faced with imminent death or great bodily harm to himself or another. 720 ILCS 5/9-2(a)(2) (West 2020); 720 ILCS 5/7-1(a) (West 2020).

¶ 51    The State's argument was thus a proper comment on the evidence and defendant's failure to establish any imminent harm that could have precipitated his unreasonable belief that the use of deadly force was necessary. None of the evidence demonstrated any imminent harm that defendant could have unreasonably interpreted as imminent death or great bodily harm against which he needed to use deadly force to defend himself. Defendant was the aggressor and opened fire on a group of people who were completely unaware of his presence. The trial court's comments similarly focused on this facet, as it did not say that defendant had no lawful justification or no reasonable justification for the shooting. It said defendant had *no* justification. This is in line with its comment that no one "displayed a weapon, pointed out the defendant, called his name, said let's go get him or nothing of the sort. Nothing." Even defense counsel's argument conceded that defendant's subjective fear was based on "stimuli" that took place in the previous "60 to 90 days" rather than the immediate events surrounding the shooting. The trial court was not required to

accept defendant's self-serving testimony, and its comments reflect that it did not do so. *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002).

¶ 52    The State did not misstate the law, nor did the trial court misapply the law. Both the State and the trial court accurately noted defendant's failure to establish any imminent harm that could have precipitated an unreasonable belief that deadly force was necessary. Thus, the trial court properly rejected defendant's claim of imperfect self-defense and found defendant proven guilty of first degree murder beyond a reasonable doubt.

¶ 53    Having determined that no error occurred, we need not take the analysis any further. The State's closing argument did not deprive defendant of a fair trial.

¶ 54                                III. CONCLUSION

¶ 55    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 56    Affirmed.