2023 IL App (1st) 220174

First District
Third Division
April 12, 2023

No. 1-22-0174

|   |   |   |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13 CR 12967 (01) |
| | ) | The Honorable |
| DIMEYON COLE, | ) ) | Lawrence E. Flood, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Burke and D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1　　After a bench trial, defendant Dimeyon Cole was convicted of 13 counts of first degree murder for his role in the death of victim Darryl Green (Darryl), who was kidnapped from a store in Broadview, Illinois, and subsequently killed near Gary, Indiana. At sentencing, the trial court merged the 13 counts of first degree murder into an intentional-murder count (720 ILCS 5/9-1(a)(1) (West 1998)) and sentenced defendant to 28 years' imprisonment. On direct appeal, defendant challenged his sentence, and we affirmed. *People v. Cole*, 2020 IL App (1st) 170893-U, ¶ 56.

¶ 2　　Thereafter, defendant filed a *pro se* postconviction petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)), which the trial court summarily dismissed as frivolous and patently without merit. Defendant now appeals that summary dismissal, contending that his postconviction petition asserted an arguable claim that

his conviction on the intentional murder charge was void, since the victim was murdered in Indiana, not in Illinois. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        In June 1999, Darryl was kidnapped from a store he owned and operated in Broadview, forced into a van at gunpoint, and ultimately driven to and killed in Indiana. In 2013, defendant and codefendants Kevin Mitchell (Mitchell), David[1] McAfee (McAfee), and Raymond Winters (Winters) were indicted by a grand jury on 13 counts of first degree murder (counts I through XIII), 8 counts of aggravated kidnapping (counts XIV through XXI), 1 count of armed robbery (count XXII), 3 counts of burglary (count XXIII through XXV), and 1 count of aggravated unlawful restraint (count XXVI).

¶ 5                                  *Mitchell's Trial*

¶ 6        Codefendant Mitchell's case proceeded to trial prior to defendant's case reaching trial.[2] In Mitchell's case, the State nol-prossed all of the charges against him except for felony murder predicated on aggravated kidnapping. *People v. Mitchell*, 2018 IL App (1st) 153355, ¶ 5. While neither Mitchell nor defendant testified at Mitchell's trial, codefendants Winters and McAfee both testified against Mitchell; in exchange for their truthful testimony, they pleaded guilty to lesser charges in connection with Darryl's death and received sentences of 10 and 30 years, respectively, to run concurrently with sentences they were already serving for unrelated offenses. *Id.* ¶ 6.

¶ 7        As we related in a prior opinion concerning Mitchell's case (see *id.* ¶¶ 7-12), the evidence presented at Mitchell's trial established that, at the time of his death, Darryl and his twin brother

---

[1]David McAfee was also known as Menard McAfee.
[2]The same trial judge presided over both Mitchell's and defendant's trials, as well as defendant's postconviction proceedings.

Darwin Green owned and operated a beeper store located in Broadview, Illinois. In June 1999, Mitchell, Winters, McAfee, and defendant discussed kidnapping someone and holding them for ransom, ultimately deciding to kidnap one of the owners of the beeper store. After casing the store, on June 18, 1999, Winters and McAfee entered the store, armed with at least one firearm, where they proceeded to duct tape and carry out Darryl, who happened to be working at the store at the time. Darryl was placed into a van, where Mitchell and defendant were waiting, and was transported to a residence located next door to Mitchell's mother's house on the 3900 block of West Maypole Avenue in Chicago.

¶ 8        At 2:30 p.m., Darwin received a phone call, in which the caller informed him " 'we got your brother' " and hung up. *Id.* ¶ 8. While Darwin initially believed the call to be a prank, he received another four or five calls to the same effect, and the caller informed Darwin that he wanted $200,000 for Darryl's return. Darwin informed the caller that he did not have $200,000, so the caller then demanded $100,000. Darwin told the caller that he needed time to obtain the funds. *Id.*

¶ 9        In the meantime, Darwin went to the beeper store, where he found the store locked. After unlocking the store, he found it in disarray. *Id.* ¶ 9. Darwin then contacted the FBI, ultimately agreeing to allow agents to record his calls. *Id.* ¶ 10. Winters testified that at 8 p.m., he called Darwin and told him to arrange for Darryl's funeral; this call was recorded by the FBI and published to the jury at Mitchell's trial. *Id.*¶ 11.

¶ 10        As we related in our opinion, "[b]elieving Darwin had contacted the authorities, defendant and his codefendants decided to drive to Indiana, approximately one and a half hours away." *Id.* ¶ 12. Winters drove the van, while Mitchell gave directions; during the drive, Darryl was beaten over the head with a steering wheel locking device and stunned with a taser. According

to Winters, they hoped that by beating Darryl, they could somehow still obtain the ransom money. Mitchell directed Winters to exit the highway when they reached Gary, Indiana, and Winters then drove down a wooded residential street, stopping by the side of the road. Defendant, Mitchell, and McAfee exited the van, and Mitchell and McAfee carried Darryl from the van and placed him in a ditch. McAfee returned to the van to serve as a lookout while Mitchell and defendant stayed with Darryl, and Winters and McAfee heard at least three gunshots. Mitchell and defendant returned to the van, where Mitchell informed them that defendant was "too scared to pull the trigger so [Mitchell] *** had to do it." *Id.* ¶ 12.

¶ 11 A jury found Mitchell guilty of felony murder, and the trial court sentenced him to 60 years in the Illinois Department of Corrections (IDOC). *Id.* ¶ 16. We affirmed Mitchell's conviction on appeal. *Id.* ¶ 55.

¶ 12 *Pretrial Proceedings*

¶ 13 After Mitchell's trial and prior to defendant's trial, defendant filed a motion to dismiss the 13 murder counts, arguing that the trial court lacked criminal jurisdiction under section 1-5 of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/1-5 (West 1998)), since the murder charges arose from actions that "occurred entirely in Indiana."[3] Defendant also filed a separate motion to dismiss the 13 nonmurder counts as barred by the statute of limitations. In response to that motion, the State nol-prossed all charges against defendant except for the murder charges, counts I through XIII.

¶ 14 Attached to the motion to dismiss the murder counts was a transcript of the grand jury testimony of FBI special agent James Stover (Stover), who had been assigned to investigate

---

[3]While we discuss it in greater detail later in our analysis, section 1-5 of the Criminal Code provides that a defendant is subject to prosecution in Illinois for a criminal offense if it is "committed either wholly or partly within the State." 720 ILCS 5/1-5(a)(1) (West 1998).

the incident in June 1999. Stover testified that his investigation revealed the following. Mitchell, defendant, Winters, and McAfee planned to kidnap Darryl and demand a ransom for his safe return. On June 18, 1999, the men entered Darryl's beeper store in Broadview, bound Darryl's hands and feet with duct tape, and forced Darryl into a van at gunpoint. The men then drove to an abandoned building in Chicago, where they continued to hold Darryl at gunpoint. In this building, the men called Darryl's brother, Darwin, several times and demanded a ransom. During the final call, recorded by the FBI, Winters and Mitchell told Darwin to "make arrangements for [Darryl]" and that "it was over." After this call, the men agreed to kill Darryl, since they believed that Darryl's family had contacted the authorities. The men then forced Darryl back into the van and drove him to a secluded area in Indiana. Mitchell and defendant carried Darryl to the secluded area, where Mitchell shot and killed Darryl. During the shooting, Winters and McAfee stood by the van.

¶ 15    Defendant subsequently supplemented the motion to dismiss with the transcripts of Winters' and McAfee's testimony from Mitchell's trial, as described above.[4]

¶ 16    In response to defendant's motion to dismiss, the State argued that Illinois had criminal jurisdiction over defendant's case, since the recorded call during which Winters and Mitchell told Darwin to " 'make arrangements for [Darryl]' " and that " '[i]t's over with, bye,' " demonstrated that the men, while in Illinois, conspired and formed the intent to murder Darryl. The State further argued that this final phone call also demonstrated their actions within Illinois constituted attempted murder, since they decided in Illinois to kill Darryl and "the decision to put [Darryl] back in the van and then drive to [Indiana] was certainly a substantial step toward the commission of the murder."

---

[4]The trial transcripts are not contained in the record on appeal.

¶ 17    The parties proceeded to a hearing on the motion. During the hearing, defense counsel argued that the grand jury testimony of Stover, as well as the trial testimony of Winters and McAfee at Mitchell's trial, demonstrated that there was no plan or other indication that Darryl was to be killed until they reached the location on the side of the road in Indiana where he was ultimately shot. Defense counsel pointed specifically to the testimony of Winters and McAfee, who testified that they both believed that Darryl was going to be released when they reached Indiana and that they were still attempting to obtain money from him during the ride.

¶ 18    In response, the State argued that "[t]he intent in this case is formed by Kevin Mitchell," who was the one in the background of the phone call instructing Winters to tell Darwin to "[m]ake arrangements for your brother," and "we ain't calling back no more, bye." The State contended that these statements provided "strong circumstantial evidence as to what the intention of these guys was," if not direct evidence. The State acknowledged that it was possible that Winters and McAfee believed that Darryl would be released, but "[t]he point is Kevin Mitchell was the mover and shaker behind this entire case." The State further argued that Winters' and McAfee's testimony in no way meant that the intent to kill was not formed in Illinois. Instead, the State claimed:

> "There was no other reason to put that body in that van and drive to Gary. None. None. They weren't taking him—this isn't a rape case to take him somewhere to do certain things to him. This was put him in the van to drive him somewhere to kill him, and that intent started in Illinois when they couldn't get the money."

¶ 19    After hearing the parties' arguments, the trial court denied the motion to dismiss. The trial court reasoned that, up to the point where Darryl was kidnapped and "phone calls were coming back and forth," it was unclear whether there was any intent to kill him. The trial court found,

6

however, that when they did not receive any ransom money and became concerned that Darwin had contacted the police, the codefendants had a motive to make the phone call informing Darwin that he should "make arrangements" for his brother and that they would not call back. In light of that motive, in addition to the beating Darryl received and the fact that they transported him to Indiana, the trial court found that, considering all of the evidence, there was a reasonable inference that the intent to kill Darryl was made in Illinois. The trial court further found that, "in fact, several acts in furtherance of that [intent] were committed here in Illinois." The trial court accordingly denied the motion to dismiss, and the parties proceeded to a bench trial.

¶ 20                                                          *Trial*

¶ 21        At trial, the State indicated that it would be proceeding on all 13 of the murder counts. As is relevant to the instant appeal, one of the counts on which the State proceeded charged that defendant intentionally or knowingly shot and killed Darryl with a firearm. See 720 ILCS 5/9-1(a)(1) (West 1998).

¶ 22        At the beginning of the defense's opening statement, defense counsel informed the trial court:

> "Judge, we would just like to inform the court that we will be pursuing the jurisdictional argument that counsel has already argued previously. And it's our position that the evidence will show that this is the wrong jurisdiction. There was no plan to kill in Illinois, no intent to kill in Illinois, and that the decision to kill was formed in Indiana and only in Indiana by Kevin Mitchell.
>
> And at the end of the evidence, it's our belief that the jurisdictional issue will not be proved beyond a reasonable doubt."

Defense counsel further argued that, should the trial court find that there was jurisdiction beyond a reasonable doubt, the State would nevertheless be unable to prove defendant's involvement in Darryl's death beyond a reasonable doubt.

¶ 23       The testimony of State witnesses during the trial included the following. Darryl's twin brother, Darwin, testified that in June 1999, the brothers operated a cell phone and beeper store. On June 18, 1999, Darwin received a telephone call from someone who said, "we got your [b]rother" and hung up. After receiving the call, Darwin went to the beeper store and found that the front door was locked. Darwin then called Darryl's fiancée, Tiffany Bailey (Bailey), who had a key to the store, and left. When Bailey arrived, she discovered that the side door was unlocked, which was unusual, and the store was in disarray. Darryl was not there, but Bailey observed his cell phone and wallet, which was missing his driver's license. Bailey called Darwin, who told her that Darryl had been kidnapped and advised her to leave the store.

¶ 24       Darwin returned to the store and observed that it was messy and appeared as if someone had rummaged through the store "looking for something." Darwin then received another phone call, during which the caller asked for $200,000. Darwin informed the caller that he "don't have that type of money," and the caller hung up. Darwin spoke to the caller four or five more times, and the demand was eventually lowered to $100,000. Darwin testified that the caller sounded "paranoid, like they knew I had talked to the police." The caller eventually asked Darwin to meet at a certain point on the side of an expressway. Darwin did not go to the meeting spot and contacted law enforcement. Darwin met with FBI agents and agreed to allow them to record his phone calls. That evening, Darwin received a final call from the kidnappers,

which was recorded; the recording was played in court, and Darwin identified his voice on the recording.[5]

¶ 25        McAfee testified that at the time of defendant's trial, he was serving a 50-year sentence for a murder conviction in an unrelated case. McAfee asserted that he was testifying pursuant to a deal in which the State recommended that the trial court sentence him to 30 years' imprisonment for the attempted murder of Darryl, to run concurrently with his prior murder sentence, in exchange for his truthful testimony in the instant case.

¶ 26        McAfee testified that, in the spring of 1999, Winters introduced him to Mitchell and defendant, and he began to "hang around" with them through the spring and summer. Mitchell owned a van, which the four men would use often. In the early summer, McAfee needed money, and Winters and Mitchell approached him about a "sting," in which they would rob a drug dealer to obtain money; they decided to "watch[ ]" a certain beeper store. On June 18, 1999, McAfee and Winters were standing on a corner when Mitchell and defendant drove up in Mitchell's van; while McAfee was not initially aware of their destination, the four men ultimately drove to the beeper store. McAfee and Winters entered the store, restrained Darryl using duct tape provided by defendant, and searched for money. The men did not find any money in the cash register, but McAfee took Darryl's wallet from his back pocket and removed Darryl's ID. When they concluded their search for money, McAfee and Winters prepared to leave, but Mitchell told the other men to bring Darryl with them, so they carried Darryl out of the store and forced him into the back of the van. Mitchell drove to his mother's house, and the men brought Darryl to the basement of a nearby abandoned building.

---

[5]While the recording was published several times during the trial and was admitted into evidence, the CD containing the recording is not contained in the record on appeal for the instant postconviction proceedings, and its complete contents are not transcribed anywhere within the record on appeal.

¶ 27    McAfee further testified that Mitchell asked Darryl for his brother's phone number. Using his cell phone, Winters called Darwin twice, demanding money for Darryl's return. Mitchell also called Darwin, demanding money. After these calls, Mitchell asked McAfee and Winters to drive to the address listed on Darryl's license and learn whether Darryl's family had contacted the police. Using defendant's vehicle, McAfee and Winters drove toward Darryl's residence while defendant and Mitchell stayed with Darryl. As McAfee and Winters approached Darryl's residence, they observed what they thought were FBI vehicles. When they observed the vehicles, they drove back to the abandoned building; while driving back, they contacted Mitchell using a walkie-talkie and told him that Darwin had " 'called the feds or the FBI.' " When they returned, Mitchell told Winters to call Darwin again. During that call, Mitchell told Winters what to say to Darwin.

¶ 28    An audio recording of that final phone call was played in court. McAfee testified that during the recording, he heard Mitchell say " '[w]e ain't calling back no more' " and heard Winters repeat those words. McAfee testified that when this call was placed, he, Mitchell, Winters, and defendant were sitting on the porch of Mitchell's mother's house.

¶ 29    After the phone call, the four men forced Darryl into the van and drove towards Indiana, a drive which took approximately 45 minutes. McAfee testified that between the time they left the abandoned house and the time they arrived at their final destination in Indiana, McAfee repeatedly beat Darryl with a steering wheel lock while defendant tased him with a stun gun. During the drive, Darryl was begging for his life, and the men told him that "his brother didn't pay the money for his ransom." McAfee testified that the purpose of hitting Darryl with the steering wheel lock was "[b]ecause we didn't get the money" and testified that he was still attempting to obtain money.

10

¶ 30    Near Gary, Indiana, the men exited the expressway and drove to "somewhere in the woods." McAfee testified that when they stopped, he believed that they would let Darryl go. Instead, McAfee, Mitchell, and defendant exited the vehicle. While McAfee stood near the van, Mitchell placed Darryl over his shoulder and walked into the woods with defendant. At that point, defendant held a firearm, and Mitchell was unarmed. McAfee then heard two or three gunshots but did not observe who fired them. When Mitchell and defendant emerged from the woods, Mitchell was holding the firearm. Mitchell placed the firearm in the van's cupholder, and they drove away, stopping to eat at a restaurant before returning to Chicago. At some point, Mitchell gave the firearm to defendant and directed him to "get rid of it." Defendant ultimately gave the firearm to McAfee and Winters, who threw it into the Chicago River.

¶ 31    Raymond Winters testified that, at the time of trial, he was serving a 25-year sentence on a prior conviction in an unrelated case. In exchange for his truthful testimony in this case, his charge in this matter was reduced from murder to attempted murder, and he received a 10-year sentence which ran concurrently to his 25-year sentence.

¶ 32    In April 1999, Winters purchased a cell phone under a false name. In June 1999, Winters and Mitchell discussed kidnapping someone to "[h]old him for ransom." They settled on two men called the "Twins," who were drug dealers who operated a beeper store. Largely consistent with McAfee's testimony, Winters described how the men targeted the beeper store and kidnapped Darryl.

¶ 33    After kidnapping Darryl, the men drove to the abandoned building and carried him into the basement of the building. When they arrived in the basement, Winters used his phone to demand money from Darwin, who said he did not have it. After several phone calls, in which

Winters lowered the price he demanded, Darwin was instructed to drive to a meeting point. Mitchell asked McAfee and Winters to discover whether Darryl's family had contacted the police by observing whether Darwin was being followed to the meeting point. While McAfee and Winters were gone, defendant stayed with Darryl, who was still bound in the basement. As Winters and McAfee drove towards Darryl's house in defendant's vehicle, they observed two vehicles, which Winters believed were FBI vehicles. Using a walkie-talkie, Winters reported to Mitchell what he observed. Winters and McAfee then returned to the abandoned building. There, Mitchell directed Winters to call Darwin and "[t]ell [Darwin] that he caused [Darryl's] death," since Darwin did not pay the ransom and called the police. Winters testified that he placed the final call to Darwin, and Mitchell was telling Winters what to say. Winters testified that he told Darwin to "make arrangements for your [b]rother" and "we ain't calling back no more."

¶ 34    The four men forced Darryl back into the van, and Mitchell directed Winters to drive the van to Indiana. Winters testified that defendant was in the passenger seat while McAfee and Mitchell were in the back of the van, where they hit and tased Darryl. Winters testified that they were "still trying to get him to tell them where some money was" and, on cross-examination, testified that he believed that they were "act[ing] like [they] were going to kill" Darryl but were actually going to drive him to Mitchell's relative's house. Instead, after they reached Indiana, Mitchell ordered Winters to stop the van and "Kevin Mitchell told [defendant] he was going to have to kill [a] dude." The other men brought Darryl to the side of the road. Winters observed Mitchell shoot Darryl twice at close range and did not know where defendant was at that time. Winters then turned his head away and heard additional shots. When the men returned to the van, Winters noticed that Mitchell was holding a pistol. They returned to

Chicago, where Mitchell cleaned out the van with bleach and removed parts of the seats with a box cutter. At some point, Mitchell told defendant to dispose of the firearm. Winters and McAfee later threw the firearm into the Chicago River.

¶ 35        Eleanor Jonson (Jonson) testified that in June 1999, she lived in Gary, Indiana. On the evening of June 18, 1999, she was driving to a friend's house when she noticed a van behind her. She parked her vehicle in the driveway and approached the house. As she entered the house, she observed the van briefly parking across the street from the house, then making a U-turn before stopping further up the road near a cemetery. When Jonson observed the U-turn, she grew curious and exited the house, standing in the front yard. She observed two men exiting the van and pulling out an object that looked like a rug, which Jonson thought might contain a body due to its apparent weight. They took the body across the street and "dumped it in a little hole." At that point, Jonson returned to the house. After she went inside, Jonson heard three shots. Jonson's friend dismissed them as fireworks; Jonson was not convinced, but neither called the police that night. The next morning, she and her friend discovered a body "with his hands behind him cuffed," and they called the police.

¶ 36        An evidence technician with the Lake County Police Department in Indiana testified that Darryl's body was found in a wooded area with his hands and ankles bound with duct tape and three .380-caliber shell casings were found nearby. The parties stipulated that the pathologist who performed the autopsy found multiple gunshots to the head and opined that the manner of death was homicide.

¶ 37        Retired FBI agent John Larsen (Larsen) testified that, during the investigation of Darryl's death, the van was recovered. After the recovery of the van, Larsen participated in the processing of the vehicle. A number of items were discovered within the van, including items

13

of clothing, a roll of duct tape, a "steering wheel safety bar[ ]," a taser, an unfired bullet, and a cell phone. During the processing of the van, Larsen tested for the presence of blood, and several areas tested positive for blood; blood on the steering wheel safety bar was ultimately determined to belong to Darryl.

¶ 38     FBI agent Matthew Alcoke (Alcoke) testified that on June 18, 1999, he met with Darwin and obtained permission to record his incoming calls. Alcoke testified that he was present during the kidnappers' final call and that FBI agents eventually determined the phone number used to call Darwin. Alcoke further testified that FBI agents investigated that phone's call history to conduct interviews. Mitchell and Winters were identified as potential suspects in 1999, but there was insufficient information to pursue charges at that time.

¶ 39     Alcoke further testified that he continued to investigate the case from 2000 to 2008. Then in 2008, McAfee, who was incarcerated for another crime, expressed interest in speaking to the FBI. In May 2009, FBI agents spoke to McAfee. Subsequently, agents interviewed Winters, who was also incarcerated for another crime. Winters eventually agreed to cooperate in this case. In June 2013, defendant and Mitchell were arrested.

¶ 40     After the State rested, defense counsel made a motion for a directed finding and "renew[ed] [the] motion on the jurisdictional issue." There was no argument on the defense's motions, and the trial court indicated that it was "going to deny it at this point in the trial." The defense presented no evidence, and the parties proceeded to closing argument.

¶ 41     During closing argument, defense counsel argued that the State had failed to prove defendant's involvement in the crime beyond a reasonable doubt, as Winters' and McAfee's accounts of events were contradictory and not credible. During the State's rebuttal, the prosecutor argued that there was sufficient evidence to prove defendant guilty beyond a

reasonable doubt. The prosecutor additionally emphasized that the State's position was that Mitchell had the intent to kill Darryl—not Winters or McAfee—and that, if the intent was only to kidnap him, then there was no reason why they could not have released him closer to home once it became apparent that they would not receive money from Darwin. Instead, the prosecutor argued, "[w]here did they go? A desolate street 50 or 60 miles away where it was dark and there was no one around. Why do you go there? You don't go there to let someone go, Judge. You go there to kill somebody so no one is around and can see you do it."

¶ 42    After considering the evidence, the trial court found defendant guilty on all counts, finding both Winters and McAfee to be credible witnesses with respect to defendant's involvement.

¶ 43                                      *Posttrial Motion*

¶ 44    After trial, defendant filed a motion for a judgment of acquittal or, in the alternative, for a new trial or dismissal based on jurisdictional grounds, which he later amended. In the motion, defendant asserted several arguments, including that the trial court erred by denying defendant's pretrial motion to dismiss for lack of jurisdiction. Defendant claimed that the evidence at trial established that there was no intent to kill or action taken in furtherance of that intent until they were in Indiana.

¶ 45    After a hearing on defendant's motion, the trial court determined that it was going to stand on its previous rulings with respect to all issues raised in the motion, and accordingly denied the motion.

¶ 46                                    *Sentencing*

¶ 47        During the sentencing hearing, the trial court merged all 13 murder counts against

defendant into count I, the intentional murder charge, and sentenced defendant to 28 years'

imprisonment. Defendant filed a motion to reconsider his sentence, which was denied.

¶ 48        Defendant filed an appeal, challenging only his sentence. *Cole*, 2020 IL App (1st) 170893-

U, ¶ 40 ("On appeal, defendant's sole contention is that his 28-year sentence *** was

excessive."). This court affirmed defendant's sentence on direct appeal. *Id.* ¶ 56.

¶ 49                            *Postconviction Proceedings*

¶ 50        In April 2021, defendant filed a *pro se* postconviction petition, alleging that his

constitutional rights were violated due to, *inter alia*, the denial of his pretrial motion to dismiss

the murder counts based on a lack of criminal jurisdiction. The petition did not allege any facts

in support of his contention, nor did he attach any affidavits or other evidence to the petition.

¶ 51        In a written order, the trial court summarily dismissed the petition as frivolous and patently

without merit. In the order, the trial court found that defendant forfeited his claim that the trial

court lacked jurisdiction, since defendant failed to raise this claim on direct appeal. The trial

court further found that, even if defendant had not forfeited this claim, it was insufficient, since

defendant's petition was "entirely conclusory" due to his failure to support his petition with

any facts, evidence, affidavits, or other support.

¶ 52        Defendant thereafter filed a motion for leave to file a late notice of appeal, and we granted

the motion. This appeal follows.

¶ 53                                    ANALYSIS

¶ 54        On appeal, defendant argues that the trial court erred in dismissing his postconviction petition, as he raised an arguable claim that his conviction on count I was void due to a lack of criminal jurisdiction under section 1-5 of the Criminal Code.

¶ 55                                    *The Act*

¶ 56        The Act provides a framework for incarcerated individuals to collaterally attack their convictions by establishing the substantial denial of a constitutional right during trial or sentencing. 725 ILCS 5/122-1(a)(1) (West 2020). "A proceeding under the Act is a collateral attack on the judgment of conviction" (internal quotation marks omitted) (*People v. Smith*, 2014 IL 115946, ¶ 22), and claims are limited to those that were not and could not have been previously litigated (*People v. Petrenko*, 237 Ill. 2d 490, 499 (2010)).

¶ 57        The Act contains a three-stage procedure for relief. *People v. Allen*, 2015 IL 113135, ¶ 21. At the first stage, a trial court must review a defendant's petition within 90 days after it has been filed and docketed. 725 ILCS 5/122-2.1(a)(2) (West 2020). The trial court shall dismiss the petition if the court determines that the petition is "frivolous or is patently without merit." *Id.* If the trial court does not dismiss the petition as "frivolous" or "patently without merit," then it advances to the second stage. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). At the second stage, counsel may be appointed for an indigent defendant. 725 ILCS 5/122-4 (West 2020); *Hodges*, 234 Ill. 2d at 10. The State must either file a motion to dismiss or file an answer within 30 days after the trial court dockets the petition. 725 ILCS 5/122-5 (West 2020); *Allen*, 2015 IL 113135, ¶ 21. To avoid dismissal, the defendant bears the burden of making a substantial showing of a constitutional violation to warrant a third-stage evidentiary hearing. *People v. English*, 403 Ill. App. 3d 121, 129 (2010). At the second stage, allegations in the petition must

be supported by the record or by accompanying affidavits. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). If the trial court determines that the defendant made a substantial showing of a constitutional violation, the petition advances to the third stage. 725 ILCS 5/122-6 (West 2020); *Allen*, 2015 IL 113135, ¶ 22. At a third-stage evidentiary hearing, the trial court determines the credibility of the witnesses, decides the weight to be given the testimony and evidence, and resolves any evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34.

¶ 58    In this case, defendant's petition was dismissed at the first stage. To survive first-stage scrutiny, a petition must state the "gist" of a constitutional claim. *Hodges*, 234 Ill. 2d at 9. Formal legal argument and citation of authority are not required (*id.*), and all well-pleaded facts that are not positively rebutted by the record are taken as true (*People v. Romero*, 2015 IL App (1st) 140205, ¶ 26). A petition may be summarily dismissed as "frivolous or patently without merit" only when it has "no arguable basis either in law or in fact." *People v. Boykins*, 2017 IL 121365, ¶ 9.

¶ 59    A petition lacks an arguable basis in law "if it is based on an indisputably meritless legal theory, such as one that is completely contradicted by the record." *Petrenko*, 237 Ill. 2d at 496. A petition lacks an arguable basis in fact "if it is based upon a fanciful factual allegation, such as one that is clearly baseless, fantastic or delusional." *Id.* The summary dismissal of a postconviction petition is reviewed *de novo*. *Id. De novo* consideration means that the reviewing court performs the same analysis the circuit court would perform and owes no deference to the lower court's judgment or reasoning. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 34.

¶ 60                                    *Criminal Jurisdiction*

¶ 61          In the instant case, defendant's postconviction petition is predicated on his claim that the

State lacked criminal jurisdiction to prosecute him for a crime which he alleges occurred in

Indiana. We accordingly begin with a brief overview of the concept of criminal jurisdiction, as

set forth in the Criminal Code.

¶ 62          Criminal jurisdiction, sometimes referred to as geographical jurisdiction, is governed by

section 1-5 of the Criminal Code, which sets forth the circumstances under which a person

may be prosecuted within this state. 720 ILCS 5/1-5 (West 1998). The purpose of section 1-5

is "to establish a broad jurisdictional basis for the prosecution in Illinois of offenses involving

persons, property, and public interests in the State." *People v. Caruso*, 119 Ill. 2d 376, 382

(1987) (citing Ill. Ann. Stat., ch. 38, ¶ 1-5, Committee Comments, at 20 (Smith-Hurd 1972));

see also *People v. Deleon*, 2015 IL App (1st) 131308, ¶ 18. Specifically, as relevant to the case

at bar, a person is subject to prosecution in Illinois for an offense which he commits, either

within or outside the state, if "[t]he offense is committed either wholly or partly within the

State" (720 ILCS 5/1-5(a)(1) (West 1998)) or if "[t]he conduct within the State constitutes an

attempt *** to commit in another jurisdiction an offense under the laws of both this State and

such other jurisdiction" (*id.* § 1-5(a)(4)). With respect to subsection (a)(1), section 1-5 further

provides that an offense is committed "partly" within the state "if either the conduct which is

an element of the offense, or the result which is such an element, occurs within the State." *Id.*

§ 1-5(b). Section 1-5 is expressly applicable to offenses committed both by the person's own

conduct and by another person's conduct for which he is legally accountable. *Id.* § 1-5(a).

¶ 63          In the case at bar, the "offense" at issue is first degree murder. See *People v. Smith*, 233 Ill.

2d 1, 16 (2009) (while the Criminal Code describes three " 'types' " of murder, first degree

murder is a single offense, and the different theories embodied in the statute are merely different ways to commit the same crime). In a homicide, if the body of the victim is found within Illinois, the death is presumed to have occurred within the state. 720 ILCS 5/1-5(b) (West 1998). If no such presumption arises, criminal jurisdiction must be proven beyond a reasonable doubt. *People v. Holt*, 91 Ill. 2d 480, 492 (1982); see also *People v. Gilliam*, 2013 IL App (1st) 113104, ¶ 34; *People v. McVay*, 2019 IL App (3d) 150821, ¶ 46. As with any other element of the offense, the State may satisfy its burden of proving criminal jurisdiction by either direct or circumstantial evidence. *Mitchell*, 2018 IL App (1st) 153355, ¶ 26; *Gilliam*, 2013 IL App (1st) 113104, ¶ 34.

¶ 64    With respect to first degree murder, our supreme court has clarified that an intent to kill in Illinois is not, in itself, sufficient to satisfy the requirements of section 1-5(a)(1); instead, an intent plus some act in furtherance of that intent is required. See *Holt*, 91 Ill. 2d at 485. While the *Holt* court declined to calculate exactly how much activity within the state is necessary, it found that a prosecution within Illinois would be appropriate if enough criminal activity to constitute a criminal attempt occurred within the state. *Id.* Thus, if there is evidence that attempted first degree murder occurred within the state, prosecution in Illinois is appropriate under either section 1-5(a)(1) or section 1-5(a)(4). [6]

---

[6] We note that each state is a separate sovereign, and that the "dual sovereignty" doctrine provides that "[w]hen a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offenses.' " *Heath v. Alabama*, 474 U.S. 82, 88-89 (1985) (quoting *United States v. Lanza*, 260 U.S. 377, 382 (1922)). Accordingly, a prosecution in Illinois in this case would have no bearing on Indiana's ability to seek a similar prosecution under Indiana law, and vice versa. See *id.* at 92 (finding that identical offenses may be prosecuted by different sovereigns without violating the double jeopardy clause).

¶ 65                                    *Forfeiture*

¶ 66         As noted, defendant's sole contention on appeal is that the trial court erred in summarily dismissing his postconviction petition, where he raised an arguable claim that his conviction on count I was void due to a lack of criminal jurisdiction. Prior to addressing the merits of the issue, we first consider the State's contention that the trial court's dismissal should be affirmed due to defendant's failure to properly present his claims. The State's argument is twofold: it first contends that defendant's claims should have been raised in a petition under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2020)), instead of in a postconviction petition, and additionally asserts that defendant's jurisdictional challenge has been forfeited as he did not raise it on direct appeal. We consider each argument in turn.

¶ 67         First, the State contends that defendant's claim, which he has styled as a challenge to the trial court's subject-matter jurisdiction, is not appropriate for inclusion in a postconviction petition. The Act provides a method for a defendant to establish the substantial denial of his constitutional rights during the proceedings which resulted in his conviction. 725 ILCS 5/122-1(a)(1) (West 2020). As such, "[t]he scope of the proceeding is limited to constitutional matters that have not been, nor could have been, previously adjudicated." *People v. Harris*, 224 Ill. 2d 115, 124 (2007). The State claims that a challenge to subject matter jurisdiction is not a constitutional matter and therefore cannot be raised in a postconviction petition. Instead, the State maintains that such a claim should be raised in a section 2-1401 petition. See, *e.g.*, *People v. Thompson*, 2015 IL 118151, ¶ 31 (a challenge to subject matter jurisdiction may be made under section 2-1401). We do not find this argument persuasive.

¶ 68         It is well-settled that "[a] voidness challenge based on a lack of personal or subject matter jurisdiction is not subject to forfeiture or other procedural restraints because a judgment entered

21

by a court without jurisdiction 'may be challenged in perpetuity.' " *Id.* (quoting *LVNV Funding, LLC v. Trice*, 2015 IL 116129, ¶ 38); see also *People v. Davis*, 156 Ill. 2d 149, 155 (1993) ("Where jurisdiction is lacking, any resulting judgment rendered is void and may be attacked either directly or indirectly at any time."). Accordingly, courts have considered challenges to allegedly void orders, including challenges to a trial court's subject matter jurisdiction, in the context of postconviction proceedings. See, *e.g.*, *People v. Sandoval-Carrillo*, 2016 IL App (2d) 140332, ¶¶ 17-21; *People v. Johnson*, 2015 IL App (2d) 140388, ¶¶ 4-6; *People v. Fulk*, 2022 IL App (2d) 210256-U, ¶¶ 23-26. In this case, defendant contends that the trial court lacked subject matter jurisdiction over him, as the offense for which he was convicted occurred in Indiana. As a lack of subject matter jurisdiction would render his conviction void, defendant was entitled to raise the claim at any time, including in a postconviction petition, and we have no need to consider whether a challenge to subject matter jurisdiction otherwise implicates constitutional concerns.

¶ 69        We turn, then, to the consideration of whether a challenge to criminal jurisdiction under section 1-5 of the Criminal Code is essentially a challenge to the trial court's subject matter jurisdiction, as defendant claims. As noted, it is only a void order which may be challenged at any time. See *Thompson*, 2015 IL 118151, ¶ 30; *Davis*, 156 Ill. 2d at 155. Otherwise, claims in a postconviction petition are limited to those which were not and could not have been previously litigated; issues which could have been raised on direct appeal, but were not, are forfeited. *Petrenko*, 237 Ill. 2d at 499. Here, the State contends that defendant's challenge to criminal jurisdiction does not concern the trial court's subject matter jurisdiction and, therefore, defendant has forfeited his claim by not raising it on direct appeal.

¶ 70     The issue of whether criminal jurisdiction is a component of subject-matter jurisdiction— and therefore results in a void order where absent—is not one which has been expressly considered by our courts;[7] since the cases discovered in our research generally involve direct appeals, there has been no need to consider whether a challenge to criminal jurisdiction may be forfeited if first raised in a postconviction petition. After careful review, however, we agree with the State that an alleged violation of section 1-5 of the Criminal Code does not implicate the trial court's subject matter jurisdiction and, therefore, defendant's failure to raise the issue on direct appeal results in its forfeiture.

¶ 71     "Jurisdiction is a fundamental prerequisite to a valid prosecution and conviction." *Davis*, 156 Ill. 2d at 155. Where jurisdiction is lacking, any resulting judgment is void. *Id.* By contrast, "a voidable judgment is one entered erroneously by a court having jurisdiction and is not subject to collateral attack." *Id.* at 155-56. Jurisdiction is commonly understood to consist of two elements: personal jurisdiction and subject matter jurisdiction. *People v. Castleberry*, 2015 IL 116916, ¶ 12. Subject-matter jurisdiction, the component of jurisdiction at issue here, "refers to the power of a court to hear and determine cases of the general class to which the proceeding in question belongs." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*,

---

[7]We note that there are some cases in which courts have described a challenge to criminal jurisdiction as a challenge to subject-matter jurisdiction. See, *e.g.*, *Caruso*, 119 Ill. 2d at 379 (characterizing the defendant's criminal jurisdiction claim as one "asserting that Illinois lacked subject-matter jurisdiction"); *People v. Rissley*, 165 Ill. 2d 364, 385 (1995) (noting that the defendant "correctly assert[ed] that the trial court lacked subject matter jurisdiction over" certain counts). Those cases, however, involved application of section 1-5 to the facts and did not directly involve the question of whether criminal jurisdiction implicates a court's subject matter jurisdiction. We also note that these cases were decided prior to our supreme court's decision in *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 336 (2002), in which it clarified that the subject matter jurisdiction of the circuit court is conferred by the constitution, not the legislature. We have also discovered an unpublished order in which section 1-5 is interpreted through the lens of subject matter jurisdiction but, again, in addition to being nonprecedential, that case is primarily concerned with application of section 1-5 to the facts. See *People v. Luczak*, 2015 IL App (1st) 132658.

199 Ill. 2d 325, 334 (2002). "With the exception of the circuit court's power to review administrative action, which is conferred by statute, a circuit court's subject matter jurisdiction is conferred entirely by our state constitution." *Id.*

¶ 72      The Illinois Constitution provides that, subject to certain express exceptions, "Circuit Courts shall have original jurisdiction of all justiciable matters" brought before them. Ill. Const. 1970, art. VI, § 9. Although "justiciable matters" are not defined in the constitution, our supreme court has explained that "a 'justiciable matter' is a controversy appropriate for review by the court, in that it is definite and concrete, as opposed to hypothetical or moot, touching upon the legal relations of parties having adverse legal interests." *Belleville Toyota*, 199 Ill. 2d at 335; *People v. Hughes*, 2012 IL 112817, ¶ 20. While the legislature may create new justiciable matters by enacting legislation creating rights and duties which were not previously available, it may not impose nonwaivable conditions precedent to a circuit court's exercise of jurisdiction. *Belleville Toyota*, 199 Ill. 2d at 335-36; see also *Castleberry*, 2015 IL 116916, ¶ 19 (finding the "void sentence rule" constitutionally unsound, since " 'a circuit court is a court of general jurisdiction, which need not look to the statute for its jurisdictional authority' " (quoting *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 530 (2001))).

¶ 73      To invoke a circuit court's subject-matter jurisdiction, "a petition or complaint need only 'alleg[e] the existence of a justiciable matter.' " *In re Luis R.*, 239 Ill. 2d 295, 301 (2010) (quoting *In re M.W.*, 232 Ill. 2d 408, 426 (2009)); see also *Hughes*, 2012 IL 112817, ¶ 21 (finding that "the sexual offenses originally alleged in the indictment fall within the general class of cases that the circuit court has the power to hear and determine under the Criminal Code of 1961, thereby invoking the circuit court's subject matter jurisdiction over a justiciable criminal matter"). Even where the claim is defectively stated, the circuit court is not divested

of its jurisdiction to consider the matter, as subject matter jurisdiction does not depend upon the legal sufficiency of the pleadings. *Belleville Toyota*, 199 Ill. 2d at 340; *Luis R.*, 239 Ill. 2d at 301; see also *Hughes*, 2012 IL 112817, ¶ 28 (finding the trial court was not divested of jurisdiction where the indictment failed to charge the offense to which the defendant pled guilty). "In other words, the *only* consideration is whether the alleged claim falls within the general class of cases that the court has the inherent power to hear and determine. If it does, then subject matter jurisdiction is present." (Emphasis in original.) *Luis R.*, 239 Ill. 2d at 301.

¶ 74    Here, where the offense alleged in the indictment—first degree murder—falls within the general class of cases which the circuit court has the power to hear under the Criminal Code, it appears clear that the trial court would have had subject-matter jurisdiction over the matter, regardless of whether the crime ultimately was determined to have occurred in Illinois or in Indiana. Defendant contends, however, that "subject-matter jurisdiction in Illinois arguably *incorporates* the necessity of a criminal offense falling within the territorial reach of the state's laws." (Emphasis in original.) We do not find this argument persuasive.

¶ 75    We have no quarrel with defendant's contention that criminal jurisdiction is a requirement underlying every criminal prosecution. See *Holt*, 91 Ill. 2d at 492-93 (where evidence of criminal jurisdiction was insufficient, the defendant's conviction was reversed and the charges dismissed). The importance of the requirement, however, does not have any bearing on whether it is jurisdictional. For instance, our supreme court previously held that the power to render a particular sentence was "as important" as personal jurisdiction and subject-matter jurisdiction (*Davis*, 156 Ill. 2d at 156) but nevertheless abolished the "void sentence rule" in *Castleberry*, 2015 IL 116916, ¶ 19, after finding that it did not implicate a circuit court's subject-matter jurisdiction. Thus, even important requirements are not necessarily

25

jurisdictional. See also *Davis*, 156 Ill. 2d at 157 (" 'There are many rights belonging to litigants—rights which a court may not properly deny, and yet which if denied do not oust the jurisdiction or render the proceedings absolutely null and void.' " (quoting *Humphries v. District of Columbia*, 174 U.S. 190, 194 (1899))).

¶ 76     While it concerns a different statute and was not cited by either party here, we find our supreme court's analysis in *Luis R.*, 239 Ill. 2d 295, to be instructive in the instant case. There, the issue was whether section 5-120 of the Juvenile Court Act of 1987 (Juvenile Court Act) deprived the trial court of jurisdiction to consider a delinquency matter where the respondent was 21 years old at the time of the filing of the delinquency petition. *Id.* at 297-98 (citing 705 ILCS 405/5-120 (West 2008)). The supreme court found that, where the State's petition asserted a claim under the Juvenile Court Act on its face, the trial court had subject matter jurisdiction to consider the claim, even when confronted with a potentially fatal pleading defect. *Id.* at 302-03.

¶ 77     We find most applicable, however, the supreme court's discussion of the language of the statute, which was titled, " 'Exclusive jurisdiction,' " and provided that " '[p]roceedings may be instituted under the provisions of this Article concerning any minor who prior to the minor's 17th birthday has violated or attempted to violate *** any federal or State law or municipal or county ordinance ***.' " *Id.* at 298 (quoting 705 ILCS 405/5-120 (West 2008)). The supreme court noted that the phrase " 'exclusive jurisdiction' " in the title of the statute was "not helpful," as it "creates the impression that section 5-120 somehow grants authority to the circuit court to adjudicate juvenile delinquency petitions, and that the limitations contained within that section are therefore limitations on the circuit court's jurisdiction." *Id.* at 304. This was not the case, however, as the circuit court's authority to adjudicate a matter derives exclusively

from the state constitution "and therefore cannot be limited by the authorizing statute." *Id.* The supreme court continued:

"That said, section 5-120's title is misleading, as that section is *not* in fact a grant of authority to the circuit court. Rather, section 5-120 is a grant of authority to *the State*, specifically defining the class of persons against whom the State may lawfully initiate juvenile delinquency petitions[.] *** Of course, that the legislature restricts the class of persons against whom the State may initiate juvenile delinquency proceedings is no guarantee that the State will always abide by those restrictions. This is where the circuit court, and its inherent authority to adjudicate 'all justiciable matters,' comes in. By initiating juvenile delinquency proceedings—that is, by filing a petition alleging that the respondent is a delinquent minor and praying that the respondent be made a ward of the court—the State is alleging the existence of justiciable matter. At this point, the circuit court's subject matter jurisdiction is triggered, and it possesses all authority to adjudicate the merits of the State's claim, including whether that claim falls outside the grant of authority conferred in section 5-120." (Emphases in original.) *Id.* at 304-05. [8]

¶ 78    Here, with respect to the issue of criminal jurisdiction, we find that a similar analysis applies. While section 1-5 is titled "State criminal jurisdiction," it is actually a grant of authority to the State, delineating the class of persons who are lawfully subject to prosecution within the state. See 720 ILCS 5/1-5(a) (West 1998) ("A person *is subject to prosecution in this State*" under certain conditions. (Emphasis added.)). It is not a limitation on the circuit court's authority and does not narrow the definition of "justiciable matter" to include only

---

[8] We also note that the supreme court recently interpreted section 5-120 of the Juvenile Court Act to authorize the State to initiate delinquency proceedings for conduct which occurred outside Illinois. *In re Kelan W.*, 2022 IL 128031, ¶ 13.

those matters which occur within the state. Where the State has alleged the existence of a justiciable matter through the issuance of an indictment, the trial court's subject matter jurisdiction is triggered, and the trial court has the authority to adjudicate the claim, including consideration of the requirements set forth in section 1-5. We therefore cannot find that criminal jurisdiction constitutes a component of subject-matter jurisdiction such that its absence renders a resulting judgment void.

¶ 79        While defendant claims that provisions of the state and federal constitutions demonstrate the necessity of territorial limits on a trial court's authority, these arguments have been directly rejected by our supreme court. While not cited by either party, our supreme court in *Caruso*, 119 Ill. 2d 376, addressed an argument that the state and federal constitutions limited the state's criminal jurisdiction to conduct within its borders. Examining the same constitutional provisions cited by defendant here—the sixth amendment to the federal constitution (U.S. Const., amend. VI) and article I, section 8, of the Illinois Constitution (Ill. Const. 1970, art. I, § 8)—the supreme court found that "[b]oth of the above-quoted provisions deal with venue rather than jurisdiction." *Caruso*, 119 Ill. 2d at 390. The supreme court distinguished venue from jurisdiction, noting that jurisdiction is the authority or power of a court to try a case, while venue concerns only the place where the case may be tried. *Id.* Consequently, it held that neither the federal nor the state constitution placed any limits on the criminal jurisdiction of Illinois. *Id.* Thus, we find no merit to defendant's contention that the state and federal constitutions limit the subject matter jurisdiction of circuit courts based on geography.

¶ 80        We also find unpersuasive defendant's citations to treatises and out-of-state authorities. First, these authorities are not precedential or binding on this court in any way and, at most, are instructive for their persuasive value where there is no Illinois case law directly on point.

See *In re A.C.*, 2016 IL App (1st) 153047, ¶ 47 (cases from foreign jurisdictions are not precedential); *Illinois State Toll Highway Authority v. Amoco Oil Co.*, 336 Ill. App. 3d 300, 307 (2003) (treatises are not binding on this court). More importantly, none of the authorities cited by defendant involve consideration of criminal jurisdiction where the state supreme court has expressly limited the types of matters which can be said to implicate subject-matter jurisdiction, as our supreme court has. Other states' interpretation of whether criminal jurisdiction is a component of subject-matter jurisdiction—or even some other, equally important kind of jurisdiction—therefore has no bearing on our interpretation of Illinois law as set forth by our supreme court. Here, our supreme court has made clear that "the *only* consideration is whether the alleged claim falls within the general class of cases that the court has the inherent power to hear and determine. If it does, then subject matter jurisdiction is present." (Emphasis in original.) *Luis R.*, 239 Ill. 2d at 301. Consequently, we cannot find that the statutory requirements of section 1-5 implicate a circuit court's subject matter jurisdiction to consider offenses under the Criminal Code. As such, since defendant's challenge to criminal jurisdiction was not raised on direct appeal, it has been forfeited and may not be raised for the first time in the instant postconviction proceedings. See *Petrenko*, 237 Ill. 2d at 499 (issues which could have been raised on direct appeal, but were not, are forfeited).

¶ 81                                                        *Arguable Claim*

¶ 82            While we have determined that defendant's claim was forfeited, as explained above, we also observe that the trial court's dismissal of defendant's postconviction petition would have been appropriate on the merits, as well. As noted, to survive first-stage scrutiny, a petition must state the "gist" of a constitutional claim (*Hodges*, 234 Ill. 2d at 9) and may be summarily

dismissed as "frivolous or patently without merit" when it has "no arguable basis either in law or in fact" (*Boykins*, 2017 IL 121365, ¶ 9).

¶ 83    In the case at bar, defendant is not challenging the underlying facts as established in his trial, nor does he contend that additional development of the factual record is necessary. Indeed, defendant recognizes that "all the facts necessary to resolve his claim can be found within the record." Instead, defendant raises a purely legal argument: whether the facts, as established in the trial court proceedings, are sufficient to comply with the requirements of section 1-5 of the Criminal Code. The trial court's application of the law to uncontested facts is subject to *de novo* review (*People v. Chapman*, 194 Ill. 2d 186, 208 (2000); *People v. Smith*, 2016 IL App (1st) 140039, ¶ 10), as is the summary dismissal of a postconviction petition generally (*Petrenko*, 237 Ill. 2d at 496). Here, we agree with the trial court that criminal jurisdiction was proper under section 1-5 of the Criminal Code and, therefore, there is no arguable basis for defendant's postconviction claim.

¶ 84    As noted, section 1-5 provides that a person is subject to prosecution in Illinois for an offense which he commits, either within or outside the state, if "[t]he offense is committed either wholly or partly within the State" (720 ILCS 5/1-5(a)(1) (West 1998)) or if "[t]he conduct within the State constitutes an attempt *** to commit in another jurisdiction an offense under the laws of both this State and such other jurisdiction" (*id.* § 1-5(a)(4)). With respect to first degree murder, as in the case at bar, if there is evidence that attempted first degree murder occurred within the state, prosecution in Illinois is appropriate under either section 1-5(a)(1) or section 1-5(a)(4).

¶ 85    A defendant commits attempted murder when he has an intent to kill and performs a substantial step towards committing murder. *People v. Valentin*, 347 Ill. App. 3d 946, 951

(2004). Here, defendant does not challenge the trial court's finding that the intent to kill was formed in Illinois. Instead, defendant contends that the evidence failed to establish that there was a substantial step towards committing murder which occurred in Illinois.

¶ 86    Whether a defendant performed a substantial step towards committing murder is generally a question of fact. *People v. Norris*, 399 Ill. App. 3d 525, 530 (2010). But see *People v. Hawkins*, 311 Ill. App. 3d 418, 423 (2000) (suggesting that whether uncontested facts constitute a substantial step under the applicable statute is a question of law). What constitutes a substantial step is determined by each case's unique facts and circumstances (*People v. Lipscomb-Bey*, 2012 IL App (2d) 110187, ¶ 24) and requires the trier of fact to hear the evidence and weigh the credibility of the witnesses before determining whether the conduct at issue was a substantial step toward the commission of the offense (*Norris*, 399 Ill. App. 3d at 530). This is especially true in a case such as this one, where the State relied on circumstantial evidence to create an inference of defendant's guilt, as an inference is a factual conclusion which is best left to the trier of fact to resolve. See *People v. Rizzo*, 362 Ill. App. 3d 444, 449 (2005). It is well-established, however, that the sufficiency of the State's evidence is not a proper issue for a postconviction proceeding. *People v. Dixon*, 2022 IL App (1st) 200162, ¶ 45. Thus, defendant's challenge to the sufficiency of the evidence is not properly before us.

¶ 87    Moreover, even if defendant's challenge was properly before us, we cannot say that the facts were insufficient to establish that there was a substantial step toward committing murder within Illinois. A substantial step towards commission of an offense "puts the defendant in a dangerous proximity to success." *Lipscomb-Bey*, 2012 IL App (2d) 110187, ¶ 24. It is not mere preparation to commit a crime, and it may not be too far removed in time and space from the principal offense. *People v. Kirchner*, 2012 IL App (2d) 110255, ¶ 18; *People v. Perkins*, 408

31

Ill. App. 3d 752, 758 (2011). A substantial step may be "the very first step beyond mere preparation" (*Hawkins*, 311 Ill. App. 3d at 428), however, and is not required to be the " 'last proximate act' to actual commission of a crime" (*Perkins*, 408 Ill. App. 3d at 758 (quoting *People v. Terrell*, 99 Ill. 2d 427, 433 (1984))).

¶ 88      Here, the evidence established that defendant and his codefendants held Darryl in the basement while placing calls in an attempt to obtain ransom from Darwin. Their initial demand for $200,000 was unsuccessful, and they lowered their demand to $100,000. The men, however, subsequently discovered that Darwin had contacted law enforcement. At that point, Mitchell ordered Winters to make a final call to Darwin, to "[t]ell [Darwin] that he caused [Darryl's] death," since Darwin did not pay the ransom and had called the police. Winters placed the call to Darwin, in which he told Darwin to "make arrangements for your [b]rother" and "we ain't calling back no more." The men then placed Darryl in a van and drove to Indiana, beating him with a steering wheel lock and tasing him with a stun gun on the way.

¶ 89      After forming an intent to kill Darryl—again, a finding which is not contested on appeal—the forcing of Darryl into the van and driving toward Indiana alone was enough to place defendant "in a dangerous proximity to success" (*Lipscomb-Bey*, 2012 IL App (2d) 110187, ¶ 24). Moreover, during the drive, the men were armed with weapons, such as a firearm and stun gun (see *id.* ¶ 25 (citing Model Penal Code § 5.01 (1985)). Further, the men beat Darryl, who was unarmed and restrained, with a steering wheel lock and tased him with the stun gun. See *People v. Nunn*, 301 Ill. App. 3d 816, 825 (1998) (finding a "defendant's act of beating the victim with his hands and [a] 40 ounce beer bottle, while the victim was unarmed and prevented from fighting back," could be considered a substantial step toward committing murder). These acts were, at the very least, a first step beyond mere preparation (see *Perkins*,

408 Ill. App. 3d at 758; *Hawkins*, 311 Ill. App. 3d at 428), and they were not too far removed in time and space from the principal offense (see *Kirchner*, 2012 IL App (2d) 110255, ¶ 18). Thus, we reject defendant's contention that no act in Illinois was taken to further the murder and find inapposite defendant's cases cited in support. See *Holt*, 91 Ill. 2d at 485-86; *People v. Rissley*, 165 Ill. 2d 364, 385 (1995); *People v. Alexander*, 354 Ill. App. 3d 832, 840-42 (2004). Consequently, where defendant's criminal jurisdiction claim did not have an arguable basis in law or fact, the trial court did not err in summarily dismissing it.

¶ 90                                    CONCLUSION

¶ 91        For the reasons set forth above, the trial court's summary dismissal of defendant's postconviction petition is affirmed.

¶ 92        Affirmed.

*People v. Cole*, 2023 IL App (1st) 220174

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-12967(01); the Hon. Lawrence E. Flood, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Hannah Lazar Pieterse, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Tasha-Marie Kelly, and Julie Riekse, Assistant State's Attorneys, of counsel), for the People. |